[Civ. No. 21273.   Second Dist., Div. Three.   Aug. 15, 1956.]

HAYWARD'S (a Corporation), Respondent, v. L. B. NELSON et al., Defendants; JOHN E. FORTE, Appellant.

Heckendorf & Schwab, Percy C. Heckendorf and Robert H. Schwab, Jr., for Appellant.

Charles S. Stevens, Jr., and A. D. Haines for Respondent.

VALLÉE, J.—Appeal by defendant Forte from a joint judgment against him and defendant Nelson for $5,592.07 in an action to recover the balance due for labor and materials furnished and supplied by plaintiff.

Plaintiff, a corporation, brought the action against Forte and Nelson individually, as copartners, and as joint venturers. Nelson defaulted and judgment was entered against him. Forte answered, denying liability. The court found that Forte and Nelson became indebted to plaintiff as joint venturers.

In April 1952 Nelson told Forte about a lot that was to be sold for about $25,000; that he could build four duplexes on the lot for not more than $25,000 a unit; they could be sold for $45,000 apiece; that if Forte would acquire the property and finance the construction, he would supervise the building of the duplexes; he was so certain they could be sold at a profit he would not charge the regular contractor's fee, but on completion they would be placed upon the market and the profits, if any, divided equally. Forte agreed.

On May 2, 1952, Forte, as "Owner," and Nelson, as "Builder," entered into a contract whereby Nelson agreed to build on a lot to be purchased by Forte four duplex houses at a cost of not more than $25,000 each, or a total of not more than $100,000, which Forte agreed to pay Nelson progressively semimonthly on presentation of invoices "subject to lending institution's approval." Forte agreed to make diligent effort to sell the houses at not less than $42,500 each, and on sale to divide equally with Nelson the profits, if any, made. It was agreed, "In the event that said houses shall be sold at a loss, then such loss will be borne by Owner and Builder Equally." It was also agreed that should the houses be rented before sold, Forte would pay Nelson half of the rents collected less operating expenses and 5½ per cent interest to Forte. Germane provisions of the contract are copied in the margin.[1] Forte purchased the lot. Title was

---

[1]WHEREAS Owner has entered into a contract for the purchase from the Estate of Hattie Belle Manning, deceased, of that certain real property in the City and County of Santa Barbara . . . [description].

"WHEREAS Owner wishes Builder to build four duplexes on said real property when he is the record owner of the same,

"Now, THEREFORE, for and in consideration of the parties hereto entering into and within agreement and of the agreements hereinafter made, it is agreed by the parties hereto as follows:

"(1) Builder hereby offers and agrees to build for Owner on said

taken in his name and so remained during the time in question.

Nelson was a general contractor who had been doing business on a large scale in Santa Barbara for about eight years. He testified: "Q. As I understand it, you suggested to Mr. Forte that you felt you could build four duplexes on the property at $25,000.00 each? A. That's right. Q. And because of your experience, your experience with a duplex on the other side of the street, you felt that it could be done at a profit? A. That's correct. Q. And you felt that Mr. Forte could make a profit out of that deal? Is that right? A. That's right. Q. As a matter of fact, you were very enthusiastic about this, were you not? A. That's correct. Q. And isn't it a fact that you told Mr. Forte that you felt so certain about it that rather than take your usual contractor's profit, you'd be willing to take one half of the net profit as your compensation? A. That's correct."

On September 16, 1952, Forte and Nelson executed a contract for construction of the duplexes. Forte, as owner, agreed to pay Nelson, as contractor, $100,744 in five progressive payments, continuing through completion of the buildings, the final payment to be made "Twenty per cent (20%) thirty-five (35) days after notice of completion is signed, provided no liens have been filed against the property." This contract further provided:

"Contractor shall pay promptly all valid bills and charges for material, labor or otherwise in connection with or arising out of the construction of said structure and will hold Owner

real property four (4) duplex houses with suitable garages, at a cost not to exceed $25,000.00 per house, or a total cost of not to exceed $100,000.00, and Owner hereby accepts said offer and agrees to pay Builder not more than $25,000.00 for each of said duplex houses, or a total of not more than $100,000.00. . . .

"(3) Owner agrees to make progress payments to Builder on said construction semi-monthly on the presentation of detailed invoices, subject to lending institution's approval. . . .

"(5) Upon the sale of said houses, Owner agrees to divide equally with Builder the profits, if any, made thereon. In determining whether there is a profit under this paragraph, Owner's cost will include the cost of said realty (including real estate commission and escrow fees), amounts paid to Builder under paragraph (1) hereof, loan fees and construction interest, and all selling expense. In the event that said houses shall be sold at a loss, then such loss will be borne by Owner and Builder Equally *alone*. [Word "alone" is cancelled in original.] o

"(6) In the event said houses should be rented by Owner prior to their sale, then Owner agrees to pay Builder one-half (½) of the rents collected therefrom until such time as the houses are sold, after all operating expenses plus 5½% interest to owner on his cash investment."

of the property free and harmless against all liens and claims of liens for labor and material, or either of them, filed against the property or any part thereof.''

The contract contained the usual terms found in building construction contracts.

Forte arranged to borrow the bulk of the construction money from a building and loan association in Santa Barbara. On September 18 four separate building-loan agreements were executed by the loan association, as lender, Forte, as owner, and Nelson, as contractor. Each agreement covered the construction of one of the four proposed duplexes. Each agreement provided that all funds received were in trust for the payment of contractors, materialmen, and laborers.[2] All funds were disbursed by the loan association to Nelson on his certificate that all materials and labor had been paid in full.

Shortly after the contract of September 16, 1952 was signed, the building program was started and Nelson was in charge until its completion. The duplexes were built in accordance with plans and specifications prepared by Nelson and approved by Forte. Nelson did not receive any compensation for his services out of the moneys advanced for construction. This was the first and only time Nelson did any building for Forte.

Plaintiff had been in the floor covering business in Santa Barbara for more than 25 years. During that time Earl B. Hayward was connected with the firm and was its president at the time involved. It had done a great deal of work for Nelson during the entire period he was engaged in business in Santa Barbara. Nelson requested Hayward to submit a bid for the floor coverings. Hayward testified that prior to bidding he talked to Nelson regarding the type of materials desired and that Nelson, referring to Forte, said, ''Now, Earl, I want a good figure on this because we are going in this thing together.'' Forte was not present at the conversation. He did not meet or talk with Hayward until long after the duplexes had been completed.

On September 27, 1952, plaintiff submitted two proposals to Nelson. The proposals were identical with the exception

[2]Each agreement said: ''. . . The undersigned, and each of them, agrees that all funds received hereunder are received in trust for the purpose of paying in full all contractors and/or materialmen and/or laborers (other than the undersigned) then or theretofore engaged in said construction, and that the undersigned shall not have any beneficial interest in said funds unless and until said purpose has been fulfilled.''

that one covered asphalt tile and the other covered rugs. They were addressed to "L. B. Nelson Co.," specified the job as "John E. Forte," and quoted prices. Nelson accepted the proposals in writing on L. B. Nelson Company letterheads, stating he had entered into a contract with Forte for construction of the duplexes, and that he agreed to pay plaintiff for the performance of the subcontract.[3]

After the subcontracts had been executed, Nelson went to plaintiff's store to select the materials and, according to Hayward's testimony, he said, "I'm in this with Mr. Forte." Forte was neither present at the conversation nor did he know anything about it. Plaintiff supplied the floor coverings.

The account for the labor and materials supplied by plaintiff was carried on its books in the regular account of L. B. Nelson & Co. Forte's name was not mentioned on the account. No bill or statement of any kind was ever at anytime sent to Forte. The only bills or statements sent out by plaintiff were billed in the name of L. B. Nelson and were sent to him. Nelson made partial payments on the account. Nelson testified he received the money from the loan association to pay plaintiff's bill but failed to pay it in full.

Hayward never saw the contracts between Forte and Nelson, never discussed them with either of them, nor did he make any attempt to determine their terms. Hayward testified that in making the proposals he did not mention Forte as one of the parties; he was dealing solely with Nelson in entering into the contracts for the job; Nelson was the general contractor, the same as in "every general contractor's job," and he was letting all contracts.

As each building was completed Forte recorded a notice of

---

[3]"ACCEPTANCE OF SUBCONTRACTOR'S PROPOSAL

"Date    October 13 1952

"To:  Hayward's
      1025 Santa Barbara Street
      Santa Barbara, California.

"Dear Sir: Having entered into a contract with Mr. John E. Forte for the erection of four (4) duplex buildings at 135 E. Valerio St., in accordance with plans and specifications prepared by ourselves and in accordance with the General Conditions of the Contract prefixed to the specifications, the undersigned hereby accepts your proposal of September 27, 1952 to provide all the materials and do all the work of [work described].

"The undersigned agrees to pay you in current funds for the faithful performance of the subcontract established by this acceptance of your proposal the sum of ($1,158.24) including tax." The acceptances are identical in form except as to materials and prices.

completion. The last building was completed on March 25, 1953, and the last notice of completion was dated March 26, 1953, and recorded March 27, 1953. Each notice of completion stated Forte was the owner and no other person had any interest in the property, showed that Nelson was the contractor, and contained the other usual provisions. At the time of completion of each building the loan association had 20 per cent of the construction cost remaining in its hands, to be held pending the filing of liens during the mechanics' liens period. No liens were filed.

The first time Hayward ever mentioned to Forte that his bill was not fully paid was during a conversation held either in June or October 1953. Forte told Hayward Nelson had been paid for the carpets during the course of construction. He asked Hayward if he had filed a mechanic's lien and when Hayward said ''No, he hadn't,'' he asked him why he had not done so. Hayward replied: '' [B]ecause he'd done business with Mr. Nelson right along and he'd always been paid and he didn't want to file a lien against him at this time.'' Hayward testified he was fully cognizant of his right to file a mechanic's lien but he had never filed one against any job he had done for Nelson.

Hayward testified that sometime after the bill became delinquent, at a meeting with Forte and Nelson, Forte said he did not have any cash with which to immediately pay plaintiff's bill; that there was then some discussion as to whether Forte would pay plaintiff's bill in the event the duplexes were sold for a profit, his recollection was that Forte agreed to do so in that event.

The first duplex completed was sold in March of 1953 for $45,000 and all of the proceeds of the sale went to the loan association and Forte. From March until near the end of May 1953 the remaining three units were constantly on the market but did not sell. Some of the apartments were rented and the rentals received prior to June 1953 went to Forte. On May 27, 1953, Forte and Nelson entered into a supplemental contract by which Nelson agreed to take over the sales and management of the duplexes upon the condition he would collect the rent; assume the taxes, insurance, loan payments and other costs; pay the balance of Forte's investment of $22,459.84 plus $16,000 profit, or $38,459.84, to Forte after payment of the unpaid balance of the loan on each duplex. It was agreed that if the $38,459.84 was not paid by December 31, 1954 ''this agreement and all prior agreements shall be

null and void. Management shall be returned to me [Forte], and you [Nelson] shall have no further interest in profits received."[4]

Nelson failed to live up to the terms of the supplemental contract and on October 1, 1953 Forte demanded in writing that he immediately make all payments due on the loans.[5] Nelson failed to make the required payments and on October 7 Forte wrote to him cancelling the contract of May 27, 1953, "which agreement superceeded [sic] our agreement of May 2, 1952."[6] Upon receipt of the letter, Nelson delivered posses-

[4]The supplemental contract provided: "You will agree to repay me the balance of my investment of $22,459.84 plus a $16,000.00 profit in the following manner:

"A. The difference between the net sales price of each Duplex and the unpaid balance of the loan is to be paid to me [Forte] as each Duplex is sold, until I have received the sum of $38,459.84.

"B. No interest is to be paid to me until March 1st, 1954, after which time, interest is to be paid on the unpaid balance at the rate of 1% per month until paid in full.

"C. In the event that the total sum of $38,459.84 together with interest as provided has not been paid to me by December 31, 1954, this agreement and all prior agreements shall be null and void. Management shall be returned to me, and you shall have no further interest in profits received."

[5]The demand read: "I have been advised that you are in default as regards the September 15th payment on the deed of trusts on the duplexes which you built for me. Also that the yardman is in arrears on garden work. As you know, you have been allowed to collect the rent with the express understanding that it be used by you for the purpose of making the trust deed payments. Since the above payment has not been made, it appears that you have diverted the money to other purposes.

"Consequently, this is to demand that you immediately make the payments now due.

"It is requested that I have your answer on the above within 48 hours so as to eliminate the necessity of taking other action."

[6]The letter read: "Demand having been previously made that you fulfill the terms of your agreement with me dated May 27, 1953, which agreement superceeded[sic] our agreement of May 2, 1952, by making payments now overdue on the deeds of trust on the property on E Valerio street consisting of three duplexes. As the same has not been done by you, and advice having recently been received that you have failed to pay the gardner [sic] who is caring for said property, this is to notify you that our agreement above referred to is hereby cancelled in its entirety and that I am assuming [sic] complete charge and control of said property for the purpose of selling or renting said property solely for my own account and benefit.

"In this connection, this is further to notify you that I am going to remove the L. B. Nelson sign now on the property, so that the public will be advised that you are in no way whatsoever connected with or concerned with said property.

"It is of course understood that the above cancellation of the May 27, 1953 agreement is expressly conditioned upon said property being in every respect lawfully returned to my control and management for sale, rental or other purposes solely for my own account and benefit."

sion of the property to Forte. Nelson testified the letter terminated any interest he had in the property and any right he had to compensation under the original contract. Several months later Forte sold the three remaining duplexes. Nelson received nothing from the proceeds.

Plaintiff commenced this action against Forte and Nelson to recover the balance owing for the floor coverings on December 4, 1953, seven and a half months after the time for filing a mechanic's lien had expired.

Forte contends the evidence will not sustain a finding of liability against him on any theory. He argues that the trial court erroneously applied the law to the facts as though this was a case between the contracting parties, i.e., between himself and Nelson.

It is unnecessary to decide whether the evidence supports the finding that Forte and Nelson, as between themselves, were joint venturers in the enterprise since we have concluded the evidence does not support the finding that Forte became indebted to plaintiff for the floor coverings or the finding that an account was stated between plaintiff and Forte and Nelson as joint venturers.

There is an important difference in construing a relationship as between the parties themselves, and as between the parties themselves and those who have dealt with one of them.     The criteria for determining the existence of the relationship of joint adventurers as between the parties themselves are not necessarily determinative where the rights of third persons are involved. (*Westcott* v. *Gilman,* 170 Cal. 562 [150 P. 777, Ann.Cas. 1916E 437] ; *Hansen* v. *Burford,* 212 Cal. 100 [297 P. 908] ; *Nowell* v. *Oswald,* 96 Cal.App. 536 [274 P. 423].) In *Westcott* v. *Gilman,* 170 Cal. 562 [150 P. 777, Ann.Cas. 1916E 437], the court stated (p. 569) :

"That as between the parties themselves, when the rights of no third persons are involved, the question is one of determination merely upon the letter of the contract and the conduct of the contracting parties to each other under it. When, however, the rights of third parties are involved, the basis of the inquiry shifts materially, and the fundamental questions are, what had those third parties the right to believe from the language of the contract and from the conduct of the parties to it as affecting them, and not as affecting each other. Each case, therefore, is adjudicated upon its own

facts, and very little value will be found from any extended review of the authorities."

*Hansen* v. *Burford*, 212 Cal. 100 [297 P. 908] is controlling. The facts were: Cole and Owen were the owners of certain lots, two of which they conveyed to Burford and wife. No cash was paid for either of the lots. Cole and Owen entered into agreements with the Burfords by which the latter agreed to obtain loans and erect houses on the lots. The agreement provided that when the houses were completed the properties should be sold to the best advantage and the profits from the resale should be equally divided between Cole and Owen on the one hand and the Burfords on the other. The Burfords were the son-in-law and daughter of one Nowling, and were acting for him. It was understood that Nowling would share equally with the Burfords in the half of the profits to which they would be entitled. The plaintiff, a lumber company, sued to recover the price of lumber which was used in constructing the houses. Nowling and the Burfords defaulted and the cause went to trial against Cole and Owen. The construction of the houses had been superintended by Nowling. He purchased the lumber and the lumber was charged to his account on the books of the plaintiff. Nowling testified he informed the plaintiff that the bills would be paid from the proceeds of loans on the property, and also that his son-in-law, Burford, and Cole and Owen "were interested with him." The trial court rendered judgment against Cole and Owen on the theory that the parties had been acting as a joint venture. The Supreme Court reversed as to Cole and Owen, holding the Burfords and Nowling were independent contractors; that the mere fact the enterprise was some sort of a joint venture and that all the defendants were participants in it was not sufficient to render all the defendants liable to the plaintiffs for lumber sold to Nowling, where it was clearly understood all material bills were to be paid from mortgage loans on the property, and Nowling, who purchased the lumber, had no actual authority from Cole and Owen to bind them to any personal liability, and all understood the writings between the parties to negative any idea that Cole and Owen should be holden for the material bills.

The court further held that the fact Nowling specified Cole and Owen as responsible men interested with him and that they originally went with Nowling when he first talked to the plaintiffs was too tenuous to support any claim of

estoppel, or any theory that the plaintiffs were entitled to recover as against Cole and Owen by reason of reliance by the plaintiffs on any ostensible agency, where it was apparent from the evidence that credit was not given to Nowling by reason of his statement, if he made any, of the relationship of the other parties to the enterprise. The court in part said (p. 106):

"We find no circumstances in the purchase of the lumber by Nowling which would preclude us from giving effect to the actual agreement between the parties and require us to hold that Cole and Owen are liable on the theory that they permitted themselves to be held out to the plaintiffs as partners or jointly liable with Nowling and the Burfords, and plaintiffs sold the lumber in reliance upon said liability. Although Nowling testified that he told plaintiffs Cole and Owen were interested with him, plaintiff Duff Hansen, who handled the transaction, said that Nowling's son-in-law was the only person he could recall as having been mentioned as a party interested. Upon the books of plaintiffs the lumber was charged to Nowling alone. The evidence falls far short of establishing a basis for liability on such theory."

We quote at length from *Hansen* v. *Burford* in the margin.[7]

---

[7] The court also said (p. 110): "There is no evidence that can be taken to mean that the appellants ever intended or were understood by Nowling or Burford to intend that any lumber should be bought except such as should be paid for from loans made in advance as provided for in the written contract. The mere arrangement for participation in the profits is by no means conclusive of the existence of a partnership. (*Coward* v. *Clanton*, 122 Cal. 451 [55 P. 147].) Partnership or none, indeed, there can be no doubt that the enterprise here involved was in some sort a joint adventure and that all of the defendants were participants in it. Appellants' contention that Nowling may have been engaged in a joint enterprise with the Burfords but that he was not a joint adventurer with the appellants seems to us a meaningless refinement. Taking it then, as established that there was such a relation, how does this affect the responsibility for debts incurred by Nowling in pursuing the business of the association?"

"[P. 111.] 'It is, as we think correctly, laid down in 33 C.J. 872 (Title Joint Adventures) that:

"'"One who is a member of a joint adventure but who is not known to be such at the time by a third person who enters into a contract with another member individually is not rendered liable to such third person for services rendered under such contract, or for damages for the breach thereof, by the fact that the contract relates to the business of the joint adventure, if the contracting member in making such contract exceeded his authority and had no power to bind his associates thereby." ' . . .

"'If there is one thing undisputed upon the testimony, taken as a whole, it is that, though the enterprise was in some sort a joint one, and, though there is in the testimony of Nowling and Burford much loose talk, largely in the nature of conclusions of the witnesses, about

■ No one associated with plaintiff saw the contracts between Forte and Nelson, ever discussed them with either Forte or Nelson, or made any attempt to ascertain their terms. Hayward did not know Forte and did not meet him until after the duplexes were completed and the lien period had expired. All plaintiff knew as to the relationship between Forte and

what Nowling was authorized to do, it was clearly understood by all the associates that all the material bills were to be paid from the mortgage loans, and that they all understood the writings to negative any idea that appellants should be holden for them.

" 'We think it clear from the record that Nowling had no actual authority from the appellants to bind them to any personal liability for lumber bills. As between the parties their arrangements will be given effect.

" 'If, then, there is any basis for the trial court's finding that appellants participated in ordering from the plaintiffs the merchandise mentioned in the complaint and agreeing to pay for it, it must rest on some apparent authority to Nowling to represent appellants in so doing. While appellants admit having originally gone with Nowling when he first talked to the Hansens, and while one of the Hansens, who so far as appears is the only one with whom Nowling talked, as we saw, testified that Nowling, in negotiating with him, said that there were "others" interested, and while Nowling says that in such negotiations he specified Cole and Owen as responsible men interested with him, yet as Hansen testifies that he did not even recollect that Nowling had mentioned appellants by name, it is clear that in furnishing the lumber the plaintiffs could have placed no particular reliance on appellants' association with Nowling, or on appellants' responsibility. They may have understood generally that there was a group of persons involved, though no group name was used and no individuals were apparently considered by them, other than Nowling and Burford, whose names alone seem to have made any impression on them. It seems clear that this evidence is too tenuous to support any claim of estoppel, or any theory that the plaintiff is entitled to recover as against the appellants by reason of reliance by the latter on any ostensible agency. It was said in *Nofsinger* v. *Goldman*, 122 Cal. 609, 614 [55 P. 425, 427], with respect to an ostensible partnership, and it may be said by analogy with respect to an ostensible agency claimed to result from a joint enterprise that:

" ' "The rule of responsibility and liability declared in section 2444 of the Civil Code is founded upon the equitable principle of estoppel. One who has suffered another to give credit or incur a liability upon the strength of his representations made or permitted, that he is in fact a partner will not thereafter be allowed to deny those representations. But as is declared in the succeeding section of the code (2445), no one is liable as a partner who is not such in fact, excepting as provided in section 2444.''

" 'It is apparent from the testimony of Mr. Hansen that credit was not given to Nowling by reason of his statement, if he made any, of the relation of the appellants to the enterprise.

" 'In these circumstances the finding of the trial court, in so far as it determines that the appellants participated in the purchase of the goods, wares and merchandise from the plaintiffs and in the agreement to pay for the same, is, it seems to us, without any substantial support in the evidence.'

''Respondents did not, by their own admission, part with their goods on the faith of payment by the appellants.''

Nelson was that Forte was the owner and Nelson the builder.

The evidence is conclusive that plaintiff relied on Nelson and not on Forte for payment of its bill. Hayward was informed by Nelson that Forte was the owner, and plaintiff's proposals to Nelson reflect that it considered Forte as the owner and Nelson the contractor. Plaintiff's proposals, accepted by Nelson, were addressed to "L. B. Nelson Co.," not to Forte and Nelson, and referred to "Job John E. Forte," not Job—Forte and Nelson. Plaintiff's contracts were with Nelson, not Forte. They expressly provided Nelson was to pay plaintiff for the labor and material furnished. Hayward testified he relied solely on Nelson as to letting the job and as to entering into the contract for the job. Plaintiff had done practically all of Nelson's floor covering work for about eight years. The account for the labor and materials supplied by plaintiff was carried on its books in the regular account of L. B. Nelson and Company. Forte's name was not mentioned on the account. No bill or statement of any kind was ever at any time sent to Forte. The only bills or statements sent out by plaintiff for the account were in the name of L. B. Nelson and were sent to him. Nelson made partial payments on the account. Hayward did not talk to Forte about the account until after the expiration of the period for filing mechanics' liens. The fact alone that Nelson told Hayward he wanted a good price "because we are going in this thing together," does not show reliance by plaintiff on Forte's credit. (See *Hansen* v. *Burford,* 212 Cal. 100, 104, 112 [297 P. 908].) At that time Forte and Hayward did not know each other, had never had any dealings, and Forte not only did not authorize the statement but knew nothing about it. Forte did not know that plaintiff was a subcontractor or that it had supplied materials, until several months after the lien period had expired. Plaintiff did not give credit to Nelson by reason of the latter's statement of Forte's relation to him. (See *Ellison* v. *Dallugge,* 139 Cal.App. 366 [33 P.2d 878].)

The evidence is without conflict that all costs of labor and material used in construction of the duplexes were to be paid from the moneys disbursed by the loan association. Plaintiff knew that. There is no evidence Nelson was authorized to use Forte's credit or that anyone did anything to lead plaintiff to believe Nelson had the right to charge anything to Forte. Hayward did not file a lien "because he'd done business with Mr. Nelson right along and he'd always been paid and he didn't want to file a lien against him at this time."

The evidence is conclusive that Nelson had no authority from Forte to bind him to any liability for the floor coverings and that plaintiff did not furnish the floor coverings on the faith of payment by Forte.

It is well established that the right to a mechanic's lien depends on compliance with the requirements of the statute; and the right to such a lien is lost by failure to commence an action within the time provided by statute. (*Howard v. Societa di Unione etc. Italiana*, 62 Cal.App.2d 842, 850 [145 P.2d 694]; 17 Cal.Jur. 81, § 50.) In *Howard v. Societa di Unione etc. Italiana, supra,* the court in holding that no joint enterprise, ostensible or otherwise was proved, commented on the failure of a party in plaintiff's position to file a mechanic's lien. The court said (p. 850):

"No mechanics' or other liens were filed by anyone; and if, in the absence of such filing, it can be said that where credit is extended to A, who uses moneys lent and goods sold to him by B to make improvements upon C's lands, B, without further showing, may recover from C and acquire a lien upon C's land without complying with the statutes providing for the filing of mechanics' liens, such statutes would be useless. . . .

"In *Burr v. Peppers Cotton Lumber Co.,* 91 Cal.App. 268 273 [266 P. 1025], it is said, quoting from 40 C.J. 53, section 14, that provisions relating to the creation, existence or right to mechanics' liens, being in derogation of the common law, should be strictly construed. And where parties have failed to comply therewith relief has been denied in numerous cases. [Citations.] . . .

"It is a maxim of jurisprudence that the law helps the vigilant before those who sleep on their rights (Civ. Code, sec. 3527); and it is well said in *DeMattos v. McGovern,* 25 Cal.App.2d 429, 433 [77 P.2d 522] that 'Equity will not come to the aid of one who, through his own delay and own fault, has lost the remedy which the law has provided.'"

We have examined the many authorities cited by plaintiff and find none of them applicable to the case at bar. As said in *Westcott v. Gilman,* 170 Cal. 562 [150 P. 777, Ann.Cas. 1916E 437], each case is to be determined on its own facts, "and very little value will be found from any extended review of the authorities."

Whatever the relation may have been between Forte and

Nelson *inter se,* there is no basis in the evidence for the judgment against Forte.

The judgment against defendant Forte is reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied September 14, 1956, and respondent's petition for a hearing by the Supreme Court was denied October 10, 1956.