[Civ. No. 22396. Second Dist., Div. Three. Jan. 8, 1958.]

HERBERT F. BARIFFI, Respondent, v. LONGRIDGE DE-
VELOPMENT COMPANY (a Corporation) et al., De-
fendants; JOSEPH A. PARKER et al., Appellants.

John F. Reed, Francis M. Reiter, Gordon & Adams, Melvin Gordon and Jack V. Adams for Appellants.

Albert A. Dorn for Respondent.

VALLÉE, J.—Appeal by certain defendants from a judgment for plaintiff for money had and received: money paid on a contract for the purchase of a parcel of realty by reference to an unrecorded map.

On August 29, 1952, defendant Frederick W. Henderson entered into an escrow to purchase a large parcel of undeveloped land near the intersection of Mulholland Drive and Coldwater Canyon in Los Angeles, referred to as the Longridge property.

On October 9, 1952, Henderson, Melvin Gordon, and Sam Adams entered into an agreement titled "Joint Venture." The agreement recited Henderson had selected and arranged for the purchase of the Longridge property; the terms of the sale were about $40,000 cash and a note and deed of trust for $209,700 "payable under release clauses" as set out in the escrow; Henderson did not have sufficient cash to comply with the terms of the escrow; and Gordon and Adams had arranged and could make available the cash required. Gordon and Adams agreed to provide $41,000 to complete the escrow. Henderson agreed to provide $20,000 for the purpose of ob-

taining engineering studies of the property and to convey it to Westwood Bonded Escrow Company as trustee. Gordon and Adams agreed to make $20,000 available for any further purposes which would enhance the value of the property. It was agreed that the trust was being created to keep the title "from becoming subject to a cloud because of the death, divorce, or legal disability, of any or all of the parties hereto, which occurrence could affect the ability of the individuals to convey a good and sufficient marketable title to said real property without court proceedings." The agreement contained these provisions:

"[T]hat any funds which become available to the parties hereto from the sale, rental, or any other source or method, from such real property, which may by good accounting procedures be construed as profits, shall be applied first to the retirement and repayment of capital. After all capital contributed by the parties hereto has been repaid, all moneys or property remaining shall be applied to the reduction of the aforementioned trust deed and note in favor of Longridge Development Company, and after said note has been paid in full, all moneys or properties shall be divided fifty (50%) per cent to Fred W. Henderson, Twenty Five (25%) to Sam Adams, and Twenty Five (25%) to Melvin Gordon."

"It is further agreed by and between the parties hereto that the persons whose funds are employed will be listed as beneficiaries of the trust hereinbefore agreed to be created."

On the same day, October 9, 1952, a bank account was opened, known as the Henderson-Gordon-Adams account, in which the funds received from the various beneficial owners of the property were deposited.

On November 1, 1952, a declaration of trust was executed by Westwood Bonded Escrow Company as trustee. Defendants Gordon, Sam Adams, Jack Adams, Parker, Kessler, Henderson and 10 others were named as beneficiaries and executed the instrument. This instrument recited Westwood had received title to the property without consideration, declared the respective interests of the beneficiaries, and provided that the trustee would hold title in trust under the following conditions and for the following purposes:

"To Convey said real property to the Beneficiary, or to such person, firm or corporation as shall have been directed in writing, by Fred W. Henderson, Melvin Gordon, and Sam Adams, acting together, and the Trustee shall not be required

to inquire into the propriety of any such direction, not put to any expense because of such direction.''

The money used by the joint venture to make the down payment for the land came from the persons named as beneficiaries in the declaration of trust with the exception of Henderson, and they understood that was what it was to be used for.

About that time Henderson, with the concurrence of Gordon and Sam Adams, employed Engineering Service Corporation to make engineering studies and a detailed investigation of the property. Such studies and investigation were made and a tentative subdivision map prepared. Prior to January 30, 1953, an architect employed by Henderson drew plans for various dwelling houses to be built on the property. Prior to January 30, 1953, a permit was applied for to build a model home on the property to be used to promote the sale of lots and homes. The permit was issued and a home built on a lot which had been purchased by defendant Gordon in January 1953. The purchase price was obtained by Gordon from the trust account.

On January 30, 1953, Longridge Investment Company was organized as a California corporation by defendants Waxer, Hirsch, and Guthrie. No application was ever filed with the Commissioner of Corporations for the issuance of stock, and no stock was ever issued.

After the corporation was organized and the model home built, an aggressive effort was made to sell lots and homes to the public. A subdivision map of the property was kept in the model home. No subdivision map was ever recorded.

In February or March 1953 Gordon, on behalf of himself, Henderson, and Sam Adams, entered into an oral option agreement with Waxer, Hirsch, and Guthrie by which Longridge Investment Company was given an option to purchase the property. The price was to be $5,000 for each building site. There were to be about 200 building sites.

On April 25, 1953, plaintiff as buyer entered into a written agreement with Longridge Investment Company[1] as seller to purchase a lot described as Lot 30, Tract 17101, with a residence to be constructed thereon by the seller for $21,500, payable $4,500 down, $2,500 on September 1, 1953, and the balance from a construction loan to be obtained by plaintiff. Plaintiff paid Longridge $4,500 on April 25 and $1,500 on

---

[1]Longridge Investment Company is at times referred to as Longridge.

September 14, 1953. Plaintiff received nothing for his money. Defendants were never able to convey title. Longridge paid Engineering Service Corporation the $4,500 it received from plaintiff. Other than the money Longridge received from plaintiff and perhaps a few other purchasers of lots, it never had any capital or funds except a nominal amount.

On July 11, 1953, Henderson, Gordon, and Sam Adams, in writing, granted Longridge Investment Company an option for 80 days to purchase the property for $1,160,000. The option indicated the property would be subdivided by Longridge. Longridge was without funds at the time. The option was never exercised.

On November 23, 1953, Gordon and Sam Adams recorded a notice of nonresponsibility, stating they were "the beneficial owners and representatives of other beneficial owners" of the Longridge property and that Longridge Investment Company and Henderson were the purchasers of the property under a contract of purchase. The latter statement was false.

The court found: 1. Prior to October 28, 1953, the persons named as beneficiaries in the declaration of trust entered into a joint venture for the purpose of purchasing the realty and dealing with the same for profit. 2. The joint venture, through its duly authorized agents acting within the scope of the joint venture, employed an engineering company to prepare a subdivision map. The joint venture agreed to cut up the realty into lots in order to make a resale of the property more feasible. 3. The joint venture, through its duly authorized agents, Gordon, Henderson, and Sam Adams, acting within the scope of the joint venture, purchased the realty. Title was taken in the names of Henderson and his wife, who immediately conveyed it to Westwood Bonded Escrow Company as trustee under the declaration of trust. 4. The declaration of trust was entered into between all the joint venturers and Westwood on November 1, 1952, in furtherance of the purposes of the joint venture. 5. The joint venture, acting through its duly authorized agents, Gordon, Henderson, and Sam Adams, who were acting within the scope of the joint venture for the purpose of furthering its purposes, planned and caused Longridge Investment Company to be formed for the purpose of subdividing the realty and selling it to the public. 6. Defendants Waxer, Guthrie, and Hirsch were requested by the joint venture to organize Longridge Investment Company. 7. No one applied for or received a permit to issue stock in Longridge Investment Company; and except

for a total of $200 paid to the corporation by Waxer, Guthrie, and Hirsch as invested capital, Longridge, during its existence, remained without capital assets or any other assets except for money received from the public for the sale of lots and homes in the realty and for small amounts loaned to the corporation by its various officers and directors. 8. Longridge Investment Company at all times was used for the benefit of the joint venture and of the officers and directors of the corporation. It was incorporated for the purpose of serving as an instrumentality of the joint venture. At all times it was the *alter ego* of the joint venture and of the individual joint venturers. It had no separate existence, nor was it intended to, apart from the joint venture. To recognize the separate existence of Longridge apart from the joint venture and the individual joint venturers would sanction a fraud and permit oppression and injustice against plaintiff. In all of the activities of Longridge and the joint venture said entities were acting as the agent each for the other. 9. The joint venturers, in behalf of the joint venture, caused Longridge Investment Company to sell lots in the Longridge property to the public and to accept and use funds so collected for the use and benefit of the joint venture and the individual joint venturers. 10. The funds paid by plaintiff to Longridge were received for the use and benefit of the joint venture and of the individual joint venturers. 11. On April 25, 1953, the joint venturers knew through various of the joint venturers that Longridge was selling lots and homes to be built in the Longridge property from an unrecorded map, that no notice of intention to subdivide had been filed with the Real Estate Commissioner, that Longridge had no title nor could it deliver any title, that neither Longridge nor the joint venture nor any of the individual joint venturers were in a financial position to subdivide the property, put in improvements, or do anything else necessary to be able to deliver a lot and home to a buyer. 12. All acts of Longridge or of defendants Gordon, Henderson, and Sam Adams were the acts of the joint venture and of the individual joint venturers. 13. Plaintiff received nothing from the joint venture or the individual joint venturers or from Longridge for his money. He never received title to any lot in the Longridge property. The consideration which plaintiff paid completely failed. Plaintiff demanded the return of his money but all he received was $100. 14. Defendants Gordon, Henderson, Sam Adams, Waxer, Jack V. Adams, Parker, and Kessler received $6,000

for their use and benefit from plaintiff. Judgment was that plaintiff recover from said defendants $5,900 with interest. Parker and Kessler appealed from the judgment "and all orders issued thereafter"; Gordon, Sam Adams, and Jack V Adams appealed separately from the judgment.

### The Appeal of Defendants Parker and Kessler

 These defendants assert the evidence is insufficient to sustain the findings and judgment against them. Their assertion is predicated on the facts that their only connection with the transactions was contributing funds to the trust and executing the declaration of trust; that neither of them had any contact with plaintiff nor participated in the sale of the lot to him; and that they had no communication with anyone to whom plaintiff's money was paid. It is argued they did not participate in a joint venture for the purpose of subdividing the Longridge property; that the declaration of trust is a true Massachusetts or business trust and they are not personally liable on any obligation incurred by the trustee's managing agents. It is also argued they did not authorize or establish an agency for the subdivision and sale of any of the Longridge property.

The contentions of these defendants are answered and refuted by the recent case of *Engineering Service Corp.* v. *Longridge Inv. Co.*, 153 Cal.App.2d 404 [314 P.2d 563]. In that case the judgment held Gordon, Sam Adams, Waxer, Hirsch, Henderson, and Guthrie personally liable to Engineering Service Corporation for the engineering services performed by it with respect to the Longridge property. It was contended on review in that case that the trial court erred in holding those parties personally liable for the obligation incurred in the name of Henderson or Longridge Investment Company and that they were not liable as joint venturers. Speaking of the same declaration of trust as we have at bar, the court in an opinion authored by Mr. Justice Ashburn stated (pp. 408-409):

"The contemplated trust agreement was made on November 1, 1952. It named 16 beneficiaries, including Henderson and the three appellants, Gordon, Adams and Waxer. All of the named beneficiaries had invested in the enterprise prior to the execution of the declaration of trust except Henderson, who was to have a 50 per cent interest just as he had under the previous joint venture agreement. This is a dry trust (see 89 C.J.S. § 17, p. 730). The trustee handles no funds, takes no part in management of trust affairs and

acts only upon joint direction of Henderson, Gordon and Adams. . . . ▮ It is expressly declared that the trustee has no duty to collect rentals, pay taxes and assessments, or to pay or attend to payment of interest or principal upon any lien on the property. The term of the trust is declared to be 21 years 'unless sooner revoked or terminated.' Section 5 says: 'This Trust may be amended, revoked or terminated at any time upon the written direction of Fred W. Henderson, Melvin Gordon and Sam Adams, acting together. No amendment, however, shall enlarge the duties or responsibilities of the Trustee nor affect its fees hereunder without its written consent.'

"In its general features this declaration is a typical business or Massachusetts trust, but all powers of management reside in the three named representatives of the beneficiaries. It should be noted that none of the investors' money went to the trustee; it was paid into a bank account handled by the three original joint venturers and known as the Henderson-Adams-Gordon account. This reservation of complete management to the representatives of the beneficiaries and to the exclusion of the trustee leaves the participants in the status of partners or joint venturers and deprives them of the advantage of a true trust arrangement. ▮ In the leading case of *Goldwater* v. *Oltman,* 210 Cal. 408, 418 [292 P. 624, 71 A.L.R. 871], the court says, concerning Massachusetts or business trusts: 'By the weight of authority, where the trustees have complete control of the business, the creators of the trust are treated as are the *cestuis que trust* of an ordinary equitable trust, and are exempt from direct personal liability to the creditors of the business; but if the trustees are subject to the control of the creators of the trust, the latter or their successors are liable as partners.' The quoted rule was adopted as the law of this state. *Bernesen* v. *Fish,* 135 Cal. App. 588, 602 [28 P.2d 67], after reviewing the authorities, says: 'When the instant case is measured by these rules it is evident that the control of the trustee over the property of the trust estate is far too limited and the control over it and the actions of the trustees by the beneficiaries is too complete to permit any doubt of the fact that the trust here in issue cannot be classified as a Massachusetts or Business Trust. It comes within the other classification in which the beneficiaries reserve to themselves such control over the trustee and trust estate that a specie [sic] of partnership is created. It makes no difference that many of these powers of control

are to be exercised by and through a "business manager." The beneficiaries expressly appoint him their agent for such purpose.' The last two sentences are significant. Henderson, Gordon and Adams were the business managers appointed by the beneficiaries for that purpose; control of the trust by those agents is control by all beneficiaries. An annotation in 156 American Law Reports 22, 42, says: 'According to this doctrine, whether an organization in the form of a business trust is a true trust or a partnership depends upon the manner in which the business is to be conducted and upon the repository of the ultimate power of control over the affairs and property of the concern. If, under the trust instrument, the trustees are vested with title to its property and with the exclusive right to manage its business and conduct its affairs, free from the control of the shareholders, the organization is treated as a trust; but if the trustees are subject to the control of the shareholders in these particulars, and the shareholders have the real mastery over the affairs of the concern, the organization is treated as a partnership and the shareholders as partners.' See also 12 Corpus Juris Secundum, section 1(4), page 814. The trust instrument at bar created a partnership or joint venture (the differentiation between the two types of association is too narrow to be of importance here). The court found it to be a joint venture. The parties, or at least some of them, seem to have recognized the true nature of the arrangement. The minutes of a meeting of the directors of Longridge (the *alter ego*) held on July 11, 1953, show that it was attended by Waxer and Guthrie, and that the following occurred: 'The chairman requested that the meeting consider a certain Option Agreement made this day by and between Melvin Gordon, Sam Adams and Frederick W. Henderson, as joint venturers for Westwood Bonded Escrow Co., and Longridge Investment Co.' When Adams and Gordon decided to file a notice of nonresponsibility on November 23, 1953, they described themselves as 'the beneficial owners and representatives of other beneficial owners' of the land. . . .

 "[P. 411.] Of course, each member of the joint venture is the agent of the others in transaction of its business. (28 Cal.Jur.2d § 9, p. 489; *Leming* v. *Oilfields Trucking Co.*, 44 Cal.2d 343, 350 [282 P.2d 23].)"

The judgment holding the various members of the joint venture, described as beneficiaries in the declaration of trust, personally liable for the debt incurred by Henderson or Long-

ridge Investment Company was affirmed. All the facts stated in the foregoing quotations from the Engineering Service Corporation case are in evidence in the present case.

The foregoing also answers the further contention of Parker and Kessler that the services of Engineering Service Corporation were not contracted for by the trust and were not an obligation of the trust, and therefore the money paid by plaintiff was not for the benefit of the joint ventures. Moreover, the $4,500 paid by plaintiff to Longridge on April 25, 1953, was immediately paid to Engineering Service Corporation in part payment for engineering services on the property.

Parker and Kessler argue they did not authorize either Henderson or Gordon or Sam Adams to cause Longridge Investment Company to be organized and a subdivision program started. The argument is predicated on the testimony of Kessler that the beneficiaries of the trust were buying raw acreage and that it was to be sold as acreage, and a stipulation that Parker would testify substantially the same as Kessler. In view of the entire record the court was not required to give credence to this testimony. There was much evidence that all of the investors left everything up to Henderson, Gordon, and Sam Adams. Kessler testified she left what was to be done with the property to Gordon's discretion. Sam Adams testified he relied on Gordon throughout the entire transaction. Moreover, *Engineering Service Corp.* v. *Longridge Inv. Co., supra,* 153 Cal.App.2d 404, is a complete answer to this contention.

It is urged that the money paid for the lot by plaintiff was not for the mutual benefit of the joint venturers. At the conclusion of the trial the judge stated he was satisfied the money plaintiff paid was for the mutual benefit of the joint venturers. Manifestly it was. It was paid to Longridge Investment Company and immediately used by it to partly pay Engineering Service Corporation for its services in the improvement of the Longridge property for subdivision purposes —in other words, to enhance the value of the property.

Judgment was entered on November 9, 1956. On November 15 plaintiff caused a writ of execution to be issued and levied on funds of defendant Parker on deposit in a bank. Parker and Kessler then filed a notice of intention to move for a new trial. On motion of Kessler the court on November 21 ordered the writ recalled, the funds released, and stayed execution until 10 days after the motion for a new trial had been heard. On November 23 on application of

plaintiff the order of November 21 was vacated. On the same day Parker and Kessler filed notice of appeal. On November 26 on motion of Parker and Kessler the court ordered that $7,900 be required for deposit in lieu of an undertaking on appeal, and that on such deposit execution be stayed pending final determination of the appeal.

Parker and Kessler contend the order of November 23 vacating the prior order of November 21 recalling the writ of execution, for practical purposes deprived them of the opportunity for a hearing on their motion for a new trial. We are not told and we fail to see how the result claimed followed from the order vacating the prior order of November 21. Notwithstanding the order vacating the order of November 21, Parker and Kessler were entitled to have their motion for a new trial heard and determined. Since they did not choose to do so but instead chose to file a notice of appeal, they may not complain. We do not see how any prejudice resulted from the order complained of.

### The Appeal of Defendants
### Gordon, Sam Adams, and Jack Adams

■■■ These defendants first assert the finding that Longridge Investment Company was the *alter ego* of the joint venturers, including the persons named as beneficiaries in the declaration of trust, is unsupported by the evidence. Gordon and Sam Adams made the same contention in *Engineering Service Corp.* v. *Longridge Inv. Co., supra,* 153 Cal.App.2d 404, in which the evidence was substantially the same as in the present case. The court held (pp. 412-413) :

"The reason assigned by defendants for incorporation of Longridge was a plan to hold the land for more than six months, then sell it to another, thus reaping a capital gain and a lesser income tax. But that does not seem to have been carried out in practice, for the corporation was at all times held out as a subdivider. Though it never acquired title to the land it made contracts for sale of lots.

■■■ "This corporation was the typical shell which has been held an alter ego for the undisclosed persons behind it. . . . The corporation made no application for a permit to issue shares of stock and issued none. An aggregate sum of $200 was paid for stock by Waxer, Hirsch, Guthrie and one La Voie; La Voie's interest in the enterprise does not appear. His contribution was $20. The stock was never issued. The corporation never had any additional capital. Its only prospect of funds for carrying on the business con-

sisted of possible loans from Henderson's two corporations, Hillcrest Construction Company and Glen-Aire Development Company, and proceeds of sales of lots. The ability or willingness of those two corporations to finance this venture rests in the realm of conjecture. Certain it is that they did not do so. Longridge did sell a few lots but it had only an option to buy the property, one which it never exercised, and of course was unable to perform its sales contracts. The incorporators were defendants Guthrie, Waxer and Hirsch. They became the only directors and officers. Waxer was made president and testified that he had no specific duty or activity in that connection. Meetings of the board of directors were few in number. Its affairs were dominated by Henderson. . . . The corporation never paid any franchise tax and forfeited its right to do business on January 3, 1955. It 'blew up,' as Henderson put it in his testimony.''

The opinion then recites that the trial court had found that Longridge Investment Company was the *alter ego* of Henderson, Gordon, Sam Adams, and their remaining joint venturers, and continues (p. 413):

''That the conclusion of *alter ego* is correct under the more recent interpretations of that doctrine will presently appear. . . .

■ ''[Pp. 415-417.] Application of the *alter ego* doctrine does not depend upon pleading or proof of fraud. 'It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice.' (*Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514, 523 [203 P.2d 522].) ■ When it is found, as here, that the corporation is but a shell, with no capital, no substantial assets, no issued stock, no permit to issue stock, and that it is conducting the affairs of the defendants (or a partnership or joint venture of which they are members) there is present sound basis for disregarding the corporate entity and fastening the debt upon the real parties in interest. ■ It is the inequitable result of refusing to pierce the corporate veil which controls the decision. *Automotriz etc. De California* v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1]: 'It has been stated that the two requirements for application of this doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. . . .

" 'The failure to issue stock or to apply at any time for a permit, although not conclusive evidence, is an indication that defendants were doing business as individuals. . . . In the Marr case [*Marr* v. *Postal Union Life Ins. Co.,* 40 Cal.App.2d 673 (105 P.2d 649)] the court stated: "While the fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an *alter ego* relationship upon its part, nevertheless it does indicate that such corporation may exist merely to serve the interests of another—a corporation or an individual." (40 Cal.App.2d at p. 682.)

" 'Another factor to be considered in determining whether individuals dealing through a corporation should be held personally responsible for the corporate obligations is whether there was an attempt to provide adequate capitalization for the corporation. In Ballantine on Corporations (rev. ed., 1946), at pages 302-303, it is stated: "If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege." ' '

"Appellants argue that this line of cases is inapplicable because plaintiff made no inquiry and was given no assurances concerning Longridge or its capital or assets, but dealt with it and it alone as the one responsible for payment for plaintiff's services. Laying aside for the moment the fact that plaintiff did not release Henderson or his principals, the contention cannot be sustained. ▮ One who deals with a corporation as such may sometimes be precluded from later denying its corporate status, but the matter is essentially one of estoppel (see *Hiehle* v. *Torrance Millworks, Inc.,* 126 Cal.App.2d 624, 629 [272 P.2d 780]), and we have no element of reliance by defendants upon any conduct of plaintiff which could give rise to that equitable conclusion. The judgment

places the burden upon those who should bear it in equity and good conscience.''

These defendants next assert the court erred in finding them personally liable since they did not personally contract with plaintiff, citing *Hansen* v. *Burford*, 212 Cal. 100 [297 P.2d 908], and *Hayward's* v. *Nelson*, 143 Cal.App.2d 807 [299 P.2d 1013]. They say all plaintiff's dealings were with Henderson and Guthrie. This contention is also answered by *Engineering Service Corp.* v. *Longridge Investment Co.*, *supra*, 153 Cal.App.2d 404, in which all the dealings of Engineering Service Corporation were with Henderson. The court stated (p. 411):

"The declaration of trust was made on November 1, 1952. Longridge was not incorporated until January 30, 1953. Henderson had entered into an escrow for the purchase of the land in August, 1952. It was closed on October 28, 1952, by recordation of a deed to him. The money for this purpose was paid out of the Henderson-Adams-Gordon bank account, the money of the other joint venturers (beneficiaries named in the declaration of trust), some $35,000 or $36,000. Henderson at once conveyed to the escrow company and the deed was recorded on October 30. He testified that he took title for that purpose. The first work order for engineering services of plaintiff was given to it by Henderson on October 28, the day he acquired title. That he was acting for the joint venture in so doing cannot be gainsaid. . . .

"[Pp. 413-415.] The original employment of plaintiff was made by Henderson individually. True, his coventurers were his principals, but their identity was undisclosed. He and they both became liable for the services, for he was acting within the scope of his authority. He told plaintiff's representatives to bill him tentatively. This it did in the first two instances. About February, 1953, after Longridge was incorporated, he advised plaintiff to send the bills to it and plaintiff did so thereafter. Its dealings continued to be with Henderson. . . .

"The cited cases of *Hansen* v. *Burford*, 212 Cal. 100, 111, 113 [297 P. 908] and *Hayward's* v. *Nelson*, 143 Cal.App.2d 807, 814 [299 P.2d 1013] are not opposed to these views. In the first instance it was found that a joint venture existed (p. 110), and in the second it was deemed unnecessary to pass upon the point (p. 814). Both proceeded upon the assumption of existence of such a venture, with the fact of its existence and the identity of its members unknown to the creditors; also, a reliance by the creditor upon the responsi-

bility of the member who incurred the debt and an excess of authority on his part in making the contract. In such circumstances it was held that the undisclosed venturers were not liable upon the contract. The Hansen case quotes from 33 Corpus Juris 872, as follows: ' "One who is a member of a joint adventure but who is not known to be such at the time by a third person who enters into a contract with another member individually is not rendered liable to such third person for services rendered under such contract, or for damages for the breach thereof, by the fact that the contract relates to the business of the joint adventure, if the contracting member in making such contract exceeded his authority and had no power to bind his associates thereby." ' (P. 111.) To this the later work adds the important qualification: '[B]ut as a general rule a member of a joint adventure can bind his undisclosed associates by such contracts as are reasonably necessary to carry on the venture.' (48 C.J.S. § 14, p. 868.) All this is under the caption 'Liability of undisclosed member.'

▆▆▆ The basic rule is stated in *Campagna* v. *Market St. Ry. Co.*, 24 Cal.2d 304, 308 [149 P.2d 281]: 'The relationship of joint venturers is that of a mutual agency, akin to a limited partnership.' In the case at bar there was no excess of authority on the part of Henderson, with whom plaintiff contracted. While the initial joint venture between Henderson, Adams and Gordon specifies that Henderson agrees to provide $20,000 for the purpose of obtaining engineering studies, it also says in paragraph 7: 'It is further agreed by and between the parties hereto and understood by them that funds other than their own may be employed to meet any cash required of the parties hereto, but that no person whose funds may be used will have any greater rights that the party hereto who employs such funds may have under the terms hereof.' This is a clear reference to the Westwood Trust and the persons who might become beneficiaries through subscription thereto. It thus appears that moneys of the beneficiaries could be used in the place of that pledged by the original venturers, and that Henderson was not obligated personally to pay initially for the engineering after the trust was financed. It has been shown above that he took title to the property for the purpose of conveying it to the trustee and that this was done immediately; also that Henderson, Gordon and Adams were constituted managers of the trust and of the joint venture which we hold to have been created thereby. The affairs of that venture actually were managed by Henderson and Gordon, and Henderson's prompt ordering of plaintiff's engineering ser-

vices was in furtherance of the existing plan. He had implied and actual authority to contract for that work and when he did so he obligated all of his coventurers, though the fact of their existence and their identities were not disclosed.''

A contention of Gordon, Sam Adams, and Jack Adams that the finding they entered into a joint venture to subdivide the land is unsupported is answered by what we have said with respect to the same contention made by Parker and Kessler. Further, there was much evidence that the land was purchased for subdividing and that a subdivision was planned from the beginning. In the first conversation between Gordon and Henderson they discussed the amount of money that would be required to do preliminary work in order to determine what the property could produce in the way of home sites and the cost of engineering studies. Interest on the deed of trust was payable semiannually. The $209,700 deed of trust was payable in installments. It is clear from the record that most of the beneficiaries understood that they were not to invest additional funds. A fair inference is that the members of the joint venture knew that the only means of providing necessary additional funds was by subdividing. Longridge Investment Company was organized for the specific purpose of subdividing the property and building homes to get a tax gain on subdivision of the property. Waxer testified that in organizing Longridge Investment Company he was dealing with Gordon, Henderson, and Sam Adams. Gordon bought a lot apparently adjoining the Longridge property. The escrow for the purchase was opened in December 1952. The purchase price was paid from the Henderson-Gordon-Adams account. Gordon was acting as trustee for the benefit of the beneficiaries of the trust in buying the lot. Gordon authorized a construction company to apply for a building permit to construct a residence on the lot to be used as a model home. The model home was used to interest people in building homes like it on the Longridge tract. A refund from the escrow through which the lot was purchased was deposited in the Henderson-Gordon-Adams account. Payments for engineering services were made from this account. In May 1953 Sam Adams gave plaintiff a house plan. Later plaintiff told Sam Adams he wanted another plan, which Adams gave him. Gordon testified that a contract between Longridge Investment Company and one Bernard Yates for some engineering work on the Longridge property was ''on our particular contract.''

These defendants say that the refusal to grant their motion to dismiss the entire case and the admission of hearsay evidence to swell the volume of proof constituted prejudicial error. It is patent from what we have said that the court did not err in refusing to dismiss the case. No reference is made to any place in the transcript where hearsay was admitted over objection. Nor was any evidence admitted for the sole purpose of swelling the volume of proof. We have read few transcripts in which the trial judge exhibited as comprehensive knowledge of the rules of evidence as shown by the judge in this case. Other points made by these defendants are covered in what we have said with respect to the appeal of Parker and Kessler.

The contract to sell to plaintiff by reference to an unrecorded subdivision map is voidable (Bus. & Prof. Code, § 11540), and he is entitled to recover the amount paid in this action *in assumpsit* for money had and received. (*Smith* v. *Bach*, 183 Cal. 259 [191 P. 14].)

The judgment and orders appealed from are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied February 6, 1958, and appellants' petitions for a hearing by the Supreme Court were denied March 6, 1958.