[Civ. No. 3242.   Fourth Dist.   Dec. 22, 1943.]

ALBERT SWARTHOUT, Respondent, v. J. DALE GEN-
TRY, Appellant.

Duckworth, Mussell & King and Fred A. Wilson for Appellant.

William Guthrie and Donald W. Jordan for Respondent.

MARKS, J.—This is an appeal from an interlocutory judgment providing for the appointment of referees to partition real property and striking a balance on an accounting between partners.

In his complaint plaintiff alleges that real estate in San Bernardino County and certain desert water holes were owned by himself and defendant as tenants in common and sought a partition of the property. Defendant denied that the property was held by the parties as tenants in common, alleging it was owned by a partnership composed of plaintiff and defendant operating under the name Gentry and Swarthout. By way of cross-complaint defendant asked for an accounting, a dissolution of the partnership, for the appointment of a re-

ceiver to take charge of and sell the partnership property and for a distribution of the proceeds.

The trial court found that the real estate and water holes were owned by the parties as tenants in common and not as partners; that a partnership existed for the purpose of running, raising, buying and selling cattle; that the partnership assets consisted of some horses, seven head of cattle and some personal property; that on an accounting it appeared that plaintiff had contributed to the partnership capital $2,616.40 more than had defendant.

An interlocutory judgment was entered which provided for the appointment of three referees to divide and allot the real property (including the water holes) between the parties and to report to the court. It was further decreed that the partnership of Gentry and Swarthout be dissolved; that a receiver be appointed to take possession of its property and sell the same; that after the expenses of the receivership be paid the balance be applied on the partnership indebtedness to plaintiff; that if that debt be not so paid in full plaintiff have judgment against defendant for one-half of the unpaid balance. The evidence shows that all of the cattle owned by the partnership, except a few strays, had been sold before September 30, 1937, under an agreement of the parties.

The principal question involved is the sufficiency of the evidence to support the finding that the real property was owned by the parties as tenants in common and that it was not an asset of the partnership. Two secondary questions are argued: (1) Could a house built by Gentry, largely by use of his own funds, and for his own private use, on real property at Big Meadows in the San Bernardino Mountains be set aside to him with sufficient ground for its convenient enjoyment, and, (2) could plaintiff demand and collect from the partnership $100 per month salary after the partnership had sold practically all of its cattle by September 30, 1937?

There is very little real conflict in the evidence. We have here a picture of two men, individualists, of honesty and integrity who had been partners and friends for sixteen years, each having absolute trust and confidence in the other, with one becoming offended over what seems to us to be a matter of minor importance, and now engaged in rather bitter litigation.

In and prior to 1907, two men, Garner and Marshall, were conducting a cattle business on the northerly or desert side of

the San Bernardino Mountains with their headquarters at Cottonwood Springs. During that year plaintiff bought Garner's interest in the business which was continued by plaintiff and Marshall as co-partners. Plaintiff filed a homestead on land surrounding Old Woman Springs and probably obtained a patent to it. Thereafter the winter headquarters of the business were located there, it being generally known as the Old Woman Springs Ranch. The summer headquarters was located on government land at Big Meadows in the San Bernardino Mountains. E. Scott Blair bought Marshall's interest in the partnership which was continued by plaintiff and Blair. Subsequently plaintiff sold his interest to Blair who conducted the business alone. Blair died in 1920 or 1921.

In 1921 plaintiff and defendant formed a partnership to purchase and conduct the cattle business formerly owned by Blair. Mrs. Blair died shortly after the death of her husband so at the time of the purchase there were two estates and two probate sales. However, for the purpose of this opinion it will not be necessary to differentiate between them. When we refer to the Blair estate or the probate sale it will be understood we are referring to either or both of them.

There was no written partnership agreement between plaintiff and defendant. The verbal agreement was described by defendant, without material contradiction from plaintiff, as follows:

"The agreement was for the operation of a cattle ranch, to raise, buy and sell cattle, horses, or whatever stock that we might decide on, on holdings that we had purchased from the estate of E. Scott Blair and Leona Blair. The agreement entered into verbally was that we would be equal partners in everything, share and share alike. Mr. Swarthout was to manage the ranch and devote his full time to it on salary. I was to look after the business part of it outside of its operation, without any compensation. We were to operate a cattle ranch with all the necessary labor and efforts on both our parts to make it a success. That was about all the agreement was at that time, when we first started. Q. Well you mentioned the salary Mr. Swarthout was to draw. How much was he to draw? A. Mr. Swarthout was to have $100 a month, his board for himself and his family and living quarters."

Each party contributed $17,500 to the partnership. Gentry's contribution was in cash. Swarthout contributed $1,000 in

cash and a claim against the estate of Blair, making his contribution equal to that of defendant.

The purchase from the Blair estate was completed by June 11, 1921. The consolidated descriptions in the deeds conveyed six parcels of real estate in fee to Albert R. Swarthout and J. Dale Gentry. They also conveyed all the right, title and interest of the estate in water rights and a number of water holes and all improvements at Big Meadows. There were also conveyed horses, cattle, saddles, bridles, windmills, pipe lines, farm machinery and other such personal property together with certificates for the purchase of state lands. The total of the considerations named in the deeds was $18,200. The balance of the $35,000, or $16,800, seems to have been used to acquire other cattle from the Blair estate. We fail to find in the record any conveyance of the title to these cattle.

Plaintiff, in his testimony, described the purchase as follows: "Q. And then you and Mr. Gentry bought all the cattle and interest of Dr. Blair and his wife? A. We did. Q. Do you remember the amount of the purchase price? A. $35,000. Q. And of that Mr. Gentry paid half of it? A. He did, yes. Q. And you paid half? A. Yes."

The parties went into possession of the property purchased from the Blair estate and continued the business so acquired. The winter headquarters were on 260 acres of patented land composing Old Woman Springs Ranch acquired in the purchase from the Blair estate. The cattle ranged on the desert during the winter months and watered at the various springs, wells and water holes described in the deeds, one of which was about 22 miles easterly from Old Woman Springs Ranch. As soon as weather conditions permitted it was the custom to move the headquarters and the stock to the summer range in the San Bernardino Mountains where they remained until they were moved back to the desert in the fall.

For the first years of the partnership the cattle on the summer range were grazed on government lands under grazing permits. Gentry, using his own private funds, bought nine sections of land in that locality from the Southern Pacific Company. He exchanged part of this land with the United States for approximately 1683 acres of government land at Big Meadows on which were located the improvements purchased from the Blair estate. The patent was issued to J. Dale Gentry and is dated July 18, 1929. He conveyed a one-half

interest in this property to plaintiff for $10,000, paid out of plaintiff's private funds.

Plaintiff described the events leading up to these transactions as follows:

"Q. Then you and Mr. Gentry at some time or other discussed the possibility and the desirability of your acquiring title to some of this grazing land which you had previously been using under these permits? A. Yes. Q. When did that discussion first occur? When did you first begin to talk about getting some land up there that you would own rather than have the permit on? A. Not long after we were together. We would naturally want to get holdings there as soon as possible. Q. Was there some particular thing that brought about the acquisition of those lands? Was there some fact that entered into it? A. In this way; that a person in there owning property naturally would have a preference on the grazing in asking for a grazing permit. Q. If you owned it you would not need a permit, would you? A. I am speaking about the Forest Service grazing area. Certainly we would not need a permit to graze on our own land. Q. One of the facts which brought about the decision to go out there and buy some land was to assure yourselves of the opportunity of continuing to graze in the summer months in that area, wasn't it? A. Yes. Q. In other words what you were doing when you were buying this land was to secure your summer range? A. That is true, yes. Q. And in securing your summer range you negotiated with the Southern Pacific and then traded Southern Pacific land with the government and you finally got this patent for some 1683 acres of land which we have here in Exhibit 6. That is right, isn't it? A. Yes, I would say so. Q. Then after you had made this change and acquired this 1600 some acres in that area you continued still to get permits covering the parts that were not owned by you? A. Yes; there were quite a few restricted areas put in, but we had this permit above those restricted areas."

The parties continued to use this patented land as summer headquarters for the cattle business conducted by the partnership. All grazing permits seem to have been issued to Swarthout and Gentry with the charges paid from partnership funds.

They also acquired title to lands around some of the desert water holes, springs and wells by the use of script. As we

have already observed some script was obtained in the purchase from the estate of Blair. Whether this was used in making the purchases or whether new script was obtained is not clear from the record. The conveyance to some or all of this property was made by the State of California to J. Dale Gentry under date of May 25, 1927. Gentry conveyed a half interest in the property to plaintiff. After the acquisition of title the partnership used the property as before to water the stock ranging on the desert.

When the properties were acquired from the estate of Blair there was a house on the Old Woman Springs Ranch which was used as the winter residence of plaintiff and also two small cabins at Big Meadows, one of which plaintiff used as his summer residence and the other was used by defendant. Plaintiff valued the improvement at Big Meadows, acquired from the Blair estate, at about $1,500. The house at the Old Woman Springs Ranch was rebuilt and enlarged at partnership expense. The cabin used by plaintiff at Big Meadows was torn down and a comfortable cabin for the use of plaintiff was built by the partnership together with a bunk house and a three-car garage which was used by both parties. Also a water supply was developed and some of the land was fenced.

Gentry desired a commodious mountain cabin for the use of himself and his guests. Plaintiff testified that Gentry "said he was going to build a house for himself there so he would feel free to entertain his friends"; that plaintiff told him, "well, to go ahead, it was all right with me"; that "I assumed he would pay for it"; that there was never any subsequent conversation about any accounting for the cost of the house. The old cabin used by Gentry was torn down and some of the lumber used for forms for the foundation of the new house. Some rock and timber from the patented land was used in the new house as was some labor furnished by employees of the partnership. The value of those contributions is very uncertain but it probably did not exceed $1,000, according to plaintiff, or $500, according to defendant. No account of their value was kept. Gentry invested $9,600 in the house and used it as his private property although the taxes on it probably were paid out of partnership funds as were the taxes on all of the real property we have mentioned.

The partnership business showed a profit to and including

the year 1928, and the year 1935, and very small profits for 1932 and 1936, with losses for the years 1929, 1930, 1931, 1933 and 1934. This seems to have been due to adverse marketing conditions as well as constriction of the range obtainable under grazing permits so that the number of cattle on the range had to be reduced.

. Defendant testified that plaintiff became dissatisfied with the partnership business in 1937; that plaintiff told him they could not get along; that he was through; that he did not know the reason for this dissatisfaction.

Plaintiff testified that they could not make any money in the cattle business so in 1937 he talked with Gentry about selling their herd and buying again when feeders were cheap; that "a friend of his, Mr. Parker, was buying cattle down in Mexico, and he told Mr. Gentry that he would have 165 head of what he thought were good quality steers, a good buy, and so Mr. Gentry thought it would be a good idea, and I did also, to take them, and Mr. Gentry said he would drop them off at Colton and send them on out to the ranch, and I said 'All right, that would be fine,' and I goes out to the ranch and waits for the cattle, and I was there about 10 days, and I came in and wanted to know what was the matter, that no cattle had come, and he had sent them on up to Bakersfield or some place up north, and I was out on the desert waiting for them. I told him I didn't think we were going to get along." The decision to sell the partnership cattle followed immediately. All of the range cattle except a few strays were sold by September 30, 1937, and the parties did not resume the business of running cattle. This action was filed on December 11, 1941.

After the cattle were sold plaintiff remained at the ranches, lived in the houses he had been occupying and superintended the properties, looking after their care and upkeep. A caretaker was employed at each headquarters and some farming done at the Old Woman Springs Ranch. The buildings, fences and other improvements at both headquarters required and received plaintiff's care and attention. Also there were a few stray cattle taken up and sold. Plaintiff received the use of the two houses without charge and his grocery and other bills covering living expenses were paid for him by the partnership. Defendant does not question these items allowed in the accounting. The trial court also credited plaintiff with

his salary of $100 per month for fifty-six months in the accounting.

Defendant seriously objects to this credit. He argues that the partnership went out of business in 1937 when it sold its cattle; that one partner is not entitled to more compensation than the other in the absence of an agreement providing for it (*Estate of McConnell,* 6 Cal.2d 493 [58 P.2d 639]); that as defendant drew no salary and the partnership business was discontinued after September 30, 1937, plaintiff was entitled to none, there being no duties for him to perform for the partnership after the sale of the cattle as there was no partnership business for him to superintend.

The soundness of this argument depends to a considerable extent on the determination of the question of just what constituted the assets of the partnership. If those assets consisted solely of the cattle, horses, saddles, harness and such equipment, then there was little partnership business for plaintiff to superintend after the sale in 1937. Under his testimony plaintiff's principal activities after that time consisted of farming operations and care of the real estate and improvement on it. Thus if the real estate was not partnership property the chief value of his services went to the individual owners and not to the partnership. On the other hand, if the real property was a partnership asset, his care of the property was a benefit to the partnership instead of to the individuals. If the land and improvements belonged to the partnership, the work done by him differed from that performed before the sale of the cattle more in the amount done than in which group, the partnership or the tenants in common, benefited by it.

The trial court found that all of the real estate and the water holes were owned by plaintiff and defendant as tenants in common. It was also found that the partnership of Gentry and Swarthout was formed in 1921; that the partnership owned all of the cattle, horses, saddles, harness, farming implements and other such personal property.

We have summarized all of the evidence bearing on these questions. There is no material conflict in it. All of the purchase price of the property acquired from the Blair estate, including land, water holes, script to purchase State lands, cattle, horses and other personal property came out of the same fund, namely, the $35,000 subscribed by the partners

and used to furnish capital for the partnership. How part of that property so purchased could become a partnership asset and the balance be owned by the partners as tenants in common is difficult to understand in the absence of an agreement to that effect. No such agreement was proved.

Plaintiff argues that the real property was conveyed to J. Dale Gentry and Albert Swarthout; that a presumption of tenancy in common arises from those conveyances; that to hold that property thus conveyed belonged to a partnership rather than to the grantees as tenants in common would violate the provisions of the statute of frauds by permitting the terms of a written instrument to be varied by parol.

We find little merit in this contention under the rules prevailing in this state and the facts presented.

■ It is well settled in California that a partnership may be formed by parol even though its sole purpose is to deal in real estate. ■ If a partnership is formed and real property is dedicated to partnership use and is used by the partnership for its sole benefit the fact that title was acquired by one or more of the partners with their private funds or was owned by them as tenants in common prior to the formation of the partnership will not necessarily defeat the claim of the partnership to ownership of the property in the absence of an express agreement that it should remain property of those in whose names title stood. Under such circumstances the owners of the legal title hold the property in trust for the partnership. (*Bastjan* v. *Bastjan*, 215 Cal. 662 [12 P.2d 627].) The rule is thus stated in *Perelli-Minetti* v. *Lawson*, 205 Cal. 642 [272 P. 573]:

"The partnership agreement was not in writing. 'A partnership in lands may be formed by an agreement in parol. Such parol agreement is valid and may be enforced between the parties.' (*Musick Cons. Oil Co.* v. *Chandler*, 158 Cal. 7, 12 [109 P. 613, 614]; *Koyer* v. *Willmon*, 150 Cal. 785, 787 [90 P. 135]; *Scott* v. *Jun[g]quist*, 179 Cal. 7, 9 [175 P. 412].) The relations between the parties were confidential and each was a trustee for the other in all partnership transactions. (*Koyer* v. *Willmon, supra.*) 'If property owned by one of the partners before the organization of the firm has been used for partnership purposes, it must be determined from the partnership agreement and the conduct of the parties, whether it has become a part of the firm property or remains the prop-

erty of the one partner. Thus a lease of premises occupied by the firm business procured by one partner before formation of the partnership may become firm property without formal assignment, if it is so understood and the partners regard it as such.' (Rowley's Modern Law of Partnership, sec. 277.) 'It is not necessary to show that the partnership property was purchased with partnership funds. Land standing in the name of an individual partner may have been contributed by him as his portion to the firm assets. The true method of determining, as between the partners themselves, whether land standing in the name of the individuals is or is not to be treated as partnership property, is to ascertain from their conduct and course of dealing the understanding and intention of the partners themselves, which, when ascertained, should unquestionably control.' . . .

"In the language of the trial court: '. . . Even though the ranch property in question may have originally come to the parties in the character of tenants in common, this character was destroyed by the parties having farmed and operated it upon joint account and as partnership property and by their acts thereby made it partnership assets.' " (See also, *McNab* v. *Mills*, 199 Cal. 231 [248 P. 657]; *Chapman* v. *Hughes*, 104 Cal. 302 [37 P. 1048, 38 P. 109].)

Nor does the statute of frauds prevent proof of the existence of a trust in favor of the partnership where title stands in the names of the partners or in that of a third person. In *Bates* v. *Babcock*, 95 Cal. 479 [30 P. 605, 29 Am.St. Rep. 133, 16 L.R.A. 745], it was held that under such circumstances the statute of frauds could not be invoked to commit a fraud on the partnership by depriving it of property belonging to it. *Peretti-Minetti* v. *Lawson, supra,* and *Bastjan* v. *Bastjan, supra,* are to the same effect.

Under these rules we cannot escape the conclusion that all of the real property involved here must be held to be partnership property and not owned by the parties as tenants in common. This also applies to water rights, springs, wells and water holes on the public domain to which the partnership may have retained possessory rights by use.

The trial court found that the cattle, horses and machinery and equipment purchased from the estate of Blair was partnership property while the Old Woman Springs Ranch, the water rights, springs, wells and water holes pur-

chased with the same funds from the same estate, used for the same purposes and many of them conveyed to the partners by the same instruments, were owned by the partners as tenants in common. These findings seem to be inconsistent and irreconcilable. Other than the property at Big Meadows and such desert property as was acquired by script purchased after the formation of the partnership, if any there be, all the property was acquired with the $35,000 subscribed by the partners as the capital of the partnership. While the actual payments to the Blair estate may have been made by each partner individually, their total represented contributions to the capital of the partnership and the purchases must be considered to have been made by it.. We cannot escape the conclusion that all of the property acquired from the estate of Blair must be held to be partnership property.

The circumstances of the purchase of the Big Meadows property were slightly different in that its cost price was advanced by one of the partners from his individual funds and the initial conveyance of title was made to him. Thereafter the other partner paid his part of the purchase price from his individual funds and a one-half interest was then deeded to him. However, the uncontradicted testimony of plaintiff, already quoted, shows that this property was acquired by the partners for the benefit of the partnership and for use by it and not for use by the individuals. Except for the cabin of defendant it was used exclusively by the partnership in the partnership business. ■ In the absence of an express contract covering the subject the conduct of the parties is the best evidence of their intention. (*Kohl v. Lytle Creek etc. Co.*, 24 Cal.App.2d 353 [75 P.2d 71].) ■ That conduct shows that the Big Meadows property was purchased and used for the partnership as partnership property. All the taxes on the real estate were paid by the partnership. A copy of a partnership income tax return is in the record showing that such taxes were deducted from the income of the partnership and that each partner could take a deduction in his individual income tax return for his proportion of the partnership loss shown for that year, which loss was augmented by the payment of taxes on the real estate. Under all these circumstances we must conclude that the contribution each partner made to the funds used to

acquire the Big Meadows property was a subscription of additional capital to the partnership; that all the property described in the findings and the judgment belonged to the partnership and not to the partners as tenants in common; that the individual partners held the real estate in trust for the partnership.

Plaintiff points to two transfers of title of real property which he maintains support the finding that the real estate was owned by the partners as tenants in common and not by the partnership. The first is a deed dated June 10, 1921, from Veatrice A. Peck conveying to Albert R. Swarthout and J. Dale Gentry all of the property both real and personal except some of the cattle purchased from the estate of Blair. There is endorsed on this deed, after the statement that the consideration for it did not exceed $100, the following: "The purpose of this deed being to partition the interests of the grantees herein named." The second is a deed from J. Dale Gentry to Inter-State Note and Mortgage Company, dated March 2, 1934, conveying a half interest in the real estate, springs, wells and water holes in controversy here. The same property was reconveyed to Gentry by the corporation on or about May 31, 1941.

The Peck conveyance was made on the advice of the attorney who was then advising the parties. Veatrice A. Peck was his secretary. Gentry and Swarthout and his wife conveyed the property to her and she immediately reconveyed it to the parties here. There was no consideration paid by either of the parties to the other. The only explanation of these conveyances in the record is in the following testimony of defendant: "I can't explain the transaction there wherein the attorney, S. W. McNab, concentrated all the property into one deed, and it was deeded to his secretary, and then back to us again for a reason I don't know. It was not deeded out from our holdings, and I don't know why that transaction was made."

We cannot see how these conveyances can affect the question of the ownership of the property. There had been at least two conveyances from the estate to Swarthout and Gentry and the attorney evidently thought it advisable to consolidate them into one. The statement on the deed that its purpose was to partition the interests of the grantees can be given little effect. It was an endorsement on the deed and

not a formal part of it. The deed did not and could not effect a partition of the property. It did not attempt to do so. It merely granted the property to "Albert R. Swarthout and J. Dale Gentry, (a single man)" thus leaving the title vested in the same parties who had been the record owners prior to their conveyance to Peck.

His reasons for his conveyance to the Inter-State Note and Mortgage Company were explained by Gentry as follows:

"I told Mr. Swarthout what I was going to do and the reason for doing it. I was at that time operating as a corporation, closed corporation, for the reason that it was necessary to concentrate all the holdings in one in order to make the proper statement at the bank of the financial condition of the company, which was bad, and on the advice of my attorney I would do that for a time to be able to operate under more lenient laws on corporation tax than it would be as a single man or individual. Mr. Swarthout stated that it was all right with him. Q Did you ever have a conversation with him after that time about the conveyance? A No sir. Q On or about May 31, 1941, the Inter-State Note and Mortgage Company conveyed the same property back to you? A Yes sir. Q Did you have a conversation with Mr. Swarthout about that conveyance? A No sir."

Mr. Swarthout denied having had this conversation with Gentry prior to the conveyance of the property to the corporation but admitted that he learned of the transfer of title as soon as he received the tax bills. He made no objection and after the transfer the property was used by the partnership as before.

█ If Gentry held the legal title to the property in trust for the partnership he could only convey that legal title subject to the same trust as the corporation was owned and controlled by him and was charged with his knowledge of the trust. While the conveyance might have afforded Swarthout grounds for dissolution of the partnership no such result followed and the partnership continued to use the property in its business and to pay taxes on it. We regard this transaction as the substitution of one trustee for another with the implied, if not the express consent of the beneficiary.

Defendant maintains that a holding that the real estate belonged to thè partnership prevents any division of the property in kind between the partners; that the only avail-

able remedy is the appointment of a receiver, the sale of the partnership property, the payment of costs, expenses and partnership debts and the distribution of the balance to the partners. In support of this argument he cites sec. 752, Code Civ. Proc.; 20 Cal.Jur. 845; *Smith* v. *Cooley,* 65 Cal. 46 [2 P. 880]; *Jameson* v. *Hayward,* 106 Cal. 682 [39 P. 1078, 46 Am.St.Rep. 268]; *Murphy* v. *Superior Court,* 138 Cal. 69 [70 P. 1070].

As a general rule on dissolution of a partnership, the court, after taking an accounting, should require the partnership property to be sold and after the costs, expenses and partnership debts are paid should divide the balance between the partners. This rule is not inflexible and there is an exception to it which may or may not be applicable here. This rule is thus stated in 20 Cal.Jur. 845: "The general rule is that the decree should direct a sale of assets and division of proceeds, as that is regarded as the fairest course to be pursued. But where there are no debts necessitating a sale, and a division of assets in kind is fair to all parties, it may be ordered." The following cases support the text: *Harper* v. *Lamping,* 33 Cal. 641; *Shuken* v. *Cohen,* 179 Cal. 279 [176 P. 447]; *Vasiljevich* v. *Radanovich,* 138 Cal.App. 97 [31 P.2d 802], and *Watterson* v. *Knapp,* 35 Cal.App.2d 283 [95 P.2d 154].

There is some conflict in the opinions of the parties about the practicability of the division of the land between them without causing a substantial loss. Gentry was of the opinion that this could not be done as the only use to which it could be put was for a cattle range and that all of it was necessary for that purpose. At one time Swarthout testified, "Mr. Swarthout, in your opinion, can this real property which you and Mr. Gentry own be divided without substantial loss to either party? A No." At another time he testified that he could suggest a fair division and would be willing to give Gentry first choice of either part.

In the cross-complaint it is alleged that a physical division of the capital assets of the partnership could not be effected without injury and loss to both partners. The trial court found that "except as otherwise hereinabove specifically found, none of the allegations of the cross-complaint are true." Plaintiff argues that this is a specific finding that the property could be distributed in kind without loss to the

partners; that this finding resolved the conflict in the evidence on this question in favor of plaintiff and is final and conclusive here. It was also found "that it does not appear from the evidence that the property, or any part of it, is so situated that partition cannot be made without great prejudice to the owners." This is a specific finding, though a vague one, on the question of partition with or without loss so the general finding does not come into play by its very terms.

As we understand the rule partition of partnership property between the owners can only be made when there are no partnership debts to any persons other than to the partners. It was here established that there were no such debts. Further it must be established that such partition can be made without serious loss to the partners. The negative finding that it does not appear from the evidence that the property is so situated "that partition cannot be made without great prejudice to the owners" is a comment on the evidence rather than a finding that the conflicting evidence established certain facts as true. Thus the conflict in the evidence on the question of partition without loss was not settled by the trial court. Until that was done no partition of the property in kind should have been decreed.

Defendant complains of that portion of the judgment which directs the setting apart to him of the house built on partnership land largely with his own money and for his own use, together with sufficient of the land for its convenient use and occupation. He also points out that no specific provision was made for a right of way over which to reach the building nor for any interest in the springs which furnish the domestic water.

The house was a substantial structure built on a cement foundation embedded in the soil. Thus as a fixture it became a part of the realty. It was built by Gentry with the knowledge and consent of Swarthout without any agreement other than that Gentry should have the use of it. Evidently the partnership paid the taxes on it as a part of the realty. As it was a fixture ownership was vested in the owner of the soil.

We must regard its value as a contribution to the assets of the partnership. (*Boskowitz* v. *Nickel*, 97 Cal. 19 [31 P. 732]; *Ng Ye Yin* v. *Lee*, 209 Cal. 379 [287 P. 341];

*Minikin* v. *Hendrix*, 15 Cal.2d 338 [101 P.2d 473].) This does not mean that Gentry should receive the full cost to him as a credit on the amount subscribed to the partnership capital. He has had the exclusive use of the house since it was built in 1927 or 1928. Like all mountain cabins it must have been subject to depreciation during the years Gentry had used it. We believe it equitable to apply the rule used where one tenant in common has erected improvements on the common property to the effect that the cotenant making the improvements should receive credit for the amount which they enhanced the value of the common property. (See, 1 A.L.R. 1202; 122 A.L.R. 241.)

There remains the question of the wages allowed plaintiff after the sale of the cattle in 1937. After that sale there remained the land and improvements besides some horses, a few cattle and some personal property belonging to the partnership. Plaintiff cared for this property and caught up some stray cattle which were sold, the proceeds being paid to the partnership. Gentry knew these services were being performed for the partnership and as a partner benefited from them. He was a party to the original agreement under which plaintiff was to be furnished living quarters and living expenses and paid $100 per month. This agreement was never altered nor rescinded. When, after September, 1937, plaintiff delivered his annual statements of account to defendant he called attention to the fact that he had not deducted his wages. These accounts showed cash received and cash expended which might explain why the unpaid wages were not charged against the partnership. Gentry made no comment when told about the unpaid wages and made no objection to the grocery bills of plaintiff, some of which were paid by checks drawn on the partnership bank account. He made no claim for rent of the living quarters occupied by plaintiff. Thus by mutual consent part of the contract for the compensation of plaintiff by the partnership was performed. Had Gentry desired to have the partnership relieved from the obligation to pay the salary he should not have remained silent until the trial of this case. The partnership received the benefit of plaintiff's services and because the amount of those services were less than before the sale of the cattle furnishes no sufficient ground for cancellation of part of the contract for compensation while leaving the re-

mainder of it in full force and effect. Had the partners desired to change the obligations of the old contract they should have negotiated a new one before accepting the benefits of plaintiff's services rendered under the old one.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied January 14, 1944, and appellant's and respondent's petitions for a hearing by the Supreme Court were denied February 17, 1944.