[Civ. No. 22533.   Second Dist., Div. Three.   May 15, 1958.]

FRANK LINDNER, Appellant, v. HYMAN FRIEDNASH, Respondent.

Smallpage & Willis, Hill, Farrer & Burrill, Lafayette J. Smallpage and Carl M. Gould for Appellant.

Benjamin T. Weinstein and McLaughlin & Casey for Respondent.

PATROSSO, J. pro tem.*—Plaintiff as assignee of the Village Winery, Inc., instituted this action to recover from defendant the balance of the purchase price of 50,000 gallons of wine allegedly sold and delivered by said assignor to the defendant. Judgment was rendered in favor of the defendant and plaintiff appeals. Throughout this opinion we shall refer to the assignor as plaintiff or simply as "winery."

There is no substantial dispute with respect to the facts. Plaintiff was a processor of wine, having its place of business at Escalon, California. One Perenchio was a wine broker in Los Angeles and as such had acted from time to time as broker for the sale of wine by plaintiff. The defendant was engaged in the retail liquor business in Las Vegas, Nevada. On November 20, 1950, Perenchio and defendant entered into a written agreement of joint venture for the purchase and sale of 50,000 gallons of sweet wine. The agreement recites that Perenchio was the purchaser of 50,000 gallons of sweet wine of the 1949-1950 vintage, stored at his winery "known as the Village Winery, located in Escalon, California"; that the purchase price thereof was 77½ cents per gallon and that Perenchio had paid on account of such purchase price the sum of $6,750. Perenchio agreed to store and maintain the wine "at his winery" in a salable condition without charge or cost to the joint venture or the defendant for such storage and maintenance. Perenchio likewise agreed to insure the wine against loss and pay the premium for such insurance, the proceeds of which insurance for any loss by reason of destruction of or damage to the wine, to be paid directly to the defendant, who should be entitled to first deduct "his investment and any expenses he may have and one-half of the profits, if any, and remit balance to" Perenchio. The latter also agreed to indemnify the defendant and save him free and harmless "of and from any loss by reason of this joint venture"; but any profits from the transaction were to be equally divided between Perenchio and the defendant. The agreement then provides as follows:

"Second Party [defendant] agrees to invest Twelve Thousand Dollars ($12,000.00) in this joint venture, which funds are to be used to complete the purchase of the above described ' merchandise, the entire purchase price being arrived at and paid as follows:

*Assigned by Chairman of Judicial Council.

Paid by First Party ................... $ 6,750.00
Paid by Second Party ................ 12,000.00
Loan from Bank ..................... 20,000.00

Total purchase price of merchandise ..... $38,750.00

"Second Party agrees to use his credit and to arrange for the loan of Twenty Thousand Dollars ($20,000.00) above mentioned, with the understanding that warehouse receipts for said wine shall be used as security for said loans.

"It is mutually agreed that warehouse receipts for said merchandise shall be issued and same used as security for the above loan and Second Party shall be designated on said warehouse receipts as the owner of said wine."

The court found that neither plaintiff nor plaintiff's assignor knew of the contents of the joint venture agreement until after plaintiff's assignor had caused the warehouse receipt to be issued in the name of the defendant as hereinafter stated.

We pause here to point out that the recital in the agreement that the Village Winery was the winery of Perenchio, was untrue as was also the representation that Perenchio had paid on account of the purchase price of the 50,000 gallons of wine therein mentioned, the sum of $6,750. In truth and in fact Perenchio had not, as of the date of the agreement, agreed to purchase the wine nor had he paid anything on account of the purchase price thereon.

On, or immediately prior to the date of the execution of the joint venture agreement above referred to, Perenchio stated to plaintiff's manager that he and defendant were going into a joint venture for 50,000 gallons of wine. When asked by plaintiff's manager how the wine was to be paid for, Perenchio stated that he would need a warehouse receipt covering the same on which to borrow money and that the receipt should be issued in the name of the defendant; Perenchio representing to the plaintiff that the defendant was reliable and that the purchase price would be paid. Pursuant to this request plaintiff caused to be delivered to Perenchio a nonnegotiable warehouse receipt issued by the Lawrence Warehouse in the name of defendant, covering 50,000 gallons of wine in the Lawrence warehouse located within the premises of plaintiff's assignor. Thereafter this receipt was returned to plaintiff with the request that one be issued in the name of the Union Bank and Trust Company so that money could be borrowed upon it. In compliance with such request plaintiff caused a

new warehouse receipt to be issued in the name of the defendant as pledgor and the Union Bank and Trust Company as pledgee. This receipt was forwarded to the bank which thereupon made a loan thereon to the defendant in the sum of $20,000, the proceeds of which loan the bank, at the direction of the defendant, remitted to the plaintiff and which amount was credited by the plaintiff on its books to the account of the defendant. At the same time defendant paid to Perenchio the additional sum of $12,000 pursuant to the terms of the joint venture agreement.[1] The trial court found "that in causing the second warehouse receipt to be issued by Lawrence Warehouse Company, plaintiff's assignor was completing its sale of such wine to the joint venture, composed of A. J. Perenchio and defendant, subject to the lien of the above-described pledge and to any such prior rights as defendant might have as against A. J. Perenchio by reason of the warehouse receipt being issued in the name of the defendant as pledgor." Later, defendant repaid the loan obtained from the Union Bank, and on January 29, 1951, the bank executed a written release of its interest in the warehouse receipt whereby it authorized the delivery to the defendant of the wine covered by the receipt issued in the name of the bank and defendant as heretofore stated.

Subsequently, Perenchio secured the delivery of some 37,919 gallons of wine by the Lawrence warehouse to various persons to whom Perenchio had sold the same, Perenchio retaining the proceeds and neither the plaintiff nor the defendant received any part thereof. Defendant sold the balance of the wine in two lots and received from the sale thereof a total of $8,184.87 which he retained. Also at some later date, defendant instituted an action against the Lawrence Warehouse Company for damages as a result of the release by it of wine upon the order of Perenchio and secured a judgment in that action in the sum of $23,815.13, which judgment was affirmed upon appeal. (*Friednash* v. *Lawrence Warehouse Co.*, 121 Cal.App.2d 202 [263 P.2d 45].) The judgment was paid in due course to the defendant and the proceeds thereof were retained by him. As a consequence, the winery received on account of the purchase price of said wine, only the sum of $20,000.

Inasmuch as the trial court found that the sale of the wine

---

[1] Why defendant, knowing there was then a balance of at least $32,000 due upon the purchase price of the wine, paid the $12,000 to Perenchio rather than plaintiff does not appear.

was made by plaintiff to the joint venture, the problem presented, reduced to its simplest terms, would appear to be this: May one joint venturer escape liability for the price of goods sold to the venture and title to which was taken in his name by reason of the fact that a portion of the money which he contributed to the venture for the payment of the purchase price thereof was, by the wrongful act of his coadventurer, converted by the latter to his own use, as was also a portion of the goods so purchased?

■ "The common definition of a joint adventure is 'a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.' (48 C.J.S. pp. 801-802; see also *Nelson* v. *Abraham*, 29 Cal.2d 745, 749-750 [177 P.2d 931], and authorities there cited." (*Sime* v. *Malouf* (1949), 95 Cal.App.2d 82, 95-96 [212 P.2d 946, 213 P.2d 788].)

■ "The relationship of joint venturers is that of a mutual agency, akin to a limited partnership." (*Campagna* v. *Market St. Ry. Co.* (1944), 24 Cal.2d 304, 308 [149 P.2d 281].)

■ In 48 Corpus Juris Secundum, pages 866-867, it is said: "Substantially the same rules with respect to principal and agent applicable to members of a partnership apply to members of a joint adventure with respect to contracts with third persons within the scope of the joint enterprise, and a joint adventurer may bind his associates by a contract which is in furtherance, or within the scope, of the joint enterprise."

■ In *Larson* v. *Thoresen* (1951), 36 Cal.2d 666, 669 [226 P.2d 571] it is said: "Where the evidence clearly shows the parties' intention to engage in a joint enterprise for profit it has been held that the principles governing joint venture apply irrespective of how title to the property is taken. (*McNab* v. *Mills*, 199 Cal. 231 [248 P. 657]; *Bastjan* v. *Bastjan*, 215 Cal. 662 [12 P.2d 627]; *Swarthout* v. *Gentry*, 62 Cal.App.2d 68 [144 P.2d 38].)"

■ A joint adventurer, holding or acquiring title to property for the joint adventure is a trustee for his coadventurers and this is so though he buys and pays for the property with his own funds. (28 Cal.Jur.2d 494.)

■ In *Lerner* v. *Sanderson* (1932), 126 Cal.App. 481, 484

[14 P.2d 564], it is held that where one joint adventurer purchases personal property pursuant to the joint venture agreement, the property belongs to the joint venture and there is liability for the purchase price against both adventurers, and further that delivery of the property to one joint adventurer constitutes delivery to both.

In light of the foregoing legal principles, it would appear clear that the defendant is liable to the plaintiff for the wine purchased and delivered to him on behalf of the joint venture. The sole and only purpose of the joint venture was to acquire by purchase 50,000 gallons of wine and to undertake to dispose of it at a profit. That the defendant knew that the purchase price of the wine had not been paid is apparent from the fact that the joint venture agreement expressly so states, and that it is expressly provided therein that $20,000 of the purchase price is to be obtained by a loan to be negotiated by the defendant upon the warehouse receipt covering the wine, to be issued in his name. Contrary to the assertion of defendant, the latter by the terms of the joint venture agreement did not agree to pay the sum of $32,000 to Perenchio, but to "invest" this sum in the joint venture in order to enable it to acquire the 50,000 gallons of wine in question. The fact that $12,000 was delivered by defendant to Perenchio does not detract from the fact that this was part of defendant's agreed contribution to the venture. It was presumably delivered to Perenchio in order that he, who had negotiated for the purchase of the wine on behalf of the joint venture, might remit the same to the one from whom the wine was being purchased by the venture.

The finding "That defendant did promise in the said joint venture agreement that he would furnish and supply to A. J. Perenchio $32,000.00, on account of the purchase price of said wine, which A. J. Perenchio represented in said joint venture agreement to be unpaid, and defendant did so furnish and supply to A. J. Perenchio such amount of money immediately upon delivery of the warehouse receipt showing Union Bank & Trust Company, as pledgee, and defendant as pledgor" does not operate to absolve defendant from liability.

"A joint adventurer does not discharge his liability for the purchase price of a commodity purchased from a third person by payments made to the associate of such joint adventure." (48 C.J.S. p. 869.)

Defendant argues that the general rule imposing liability upon joint venturers for debts incurred in carrying out the

joint venture enterprise, is not applicable "with respect to a joint venture wherein one of the joint venturers agrees to contribute some specific thing to the joint venture." If by this statement defendant undertakes to assert that a joint venturer who agrees to contribute a stated sum of money to the capital of a joint venture is not liable for debts contracted by the venture for the purpose of carrying out the purposes for which it was formed, it is clearly erroneous. The only authorities cited by defendant in support of this contention are *Hayward's* v. *Nelson*, 143 Cal.App.2d 807 [299 P.2d 1013] and *Hansen* v. *Burford*, 212 Cal. 100 [297 P. 908]. The inapplicability of these cases to the factual situation here is best illustrated by the following language of Mr. Justice Ashburn in *Engineering etc. Corp.* v. *Longridge Inv. Co.*, 153 Cal.App. 2d 404 [314 P.2d 563], quoted with approval by this court in *Bariffi* v. *Longridge Development Co.* (1958), 156 Cal.App.2d 583, 597-598 [320 P.2d 192] :

"The cited cases of *Hansen* v. *Burford*, 212 Cal. 100, 111, 113 [297 P. 908] and *Hayward's* v. *Nelson*, 143 Cal.App.2d 807, 814 [299 P.2d 1013] are not opposed to these views. In the first instance it was found that a joint venture existed (p. 110), and in the second it was deemed unnecessary to pass upon the point (p. 814). Both proceeded upon the assumption of existence of such a venture, with the fact of its existence and the identity of its members unknown to the creditors; also, a reliance by the creditor upon the responsibility of the member who incurred the debt and an excess of authority on his part in making the contract. In such circumstances it was held that the undisclosed venturers were not liable upon the contract. The Hansen case quotes from 33 Corpus Juris 872, as follows: ' "One who is a member of a joint adventure but who is not known to be such at the time by a third person who enters into a contract with another member individually is not rendered liable to such third person for services rendered under such contract, or for damages for the breach thereof, by the fact that the contract relates to the business of the joint adventure, if the contracting member in making such contract exceeded his authority and had no power to bind his associates thereby." ' (P. 111.) To this the later work adds the important qualification: '[B]ut as a general rule a member of a joint adventure can bind his undisclosed associates by such contracts as are reasonably necessary to carry on the venture.' (48 C.J.S. § 14, p.

868.) All this is under the caption 'Liability of undisclosed member.' ''

The case here is not one where plaintiff seeks to charge defendant as an undisclosed member of a joint venture upon a contract with respect to which the contracting member was without power to bind his associates. The evidence is uncontradicted that plaintiff knew of the joint venture and that defendant was a member thereof at the time it agreed to sell the wine to the venture, and the trial court expressly found that the sale was to the venture and not to Perenchio. Moreover, as the very purpose of the venture was to acquire 50,000 gallons of wine, it may not be said that Perenchio was without power to purchase the same from plaintiff and bind defendant thereby.

██ Defendant in his brief stresses the fact that the trial court found that plaintiff, in authorizing the delivery of a warehouse receipt in the name of defendant, ''did not then rely upon defendant as the party who was obligated to pay plaintiff's assignor for the purchase of said wine, but trusted and relied upon A. J. Perenchio and his assurance that defendant would pay for such wine.'' It is difficult to reconcile this finding with that to the effect ''That in causing the second warehouse receipt to be issued by Lawrence Warehouse Company, plaintiff's assignor was completing its sale of such wine to the joint venture, composed of A. J. Perenchio and defendant.'' The fact that plaintiff in making the sale to the joint venture may have relied upon the promise of Perenchio that defendant would pay for the wine, does not serve to negate defendant's liability as a member of the joint venture for a debt incurred by it in promoting the business of the venture. Plaintiff may not be entitled to recover against defendant upon the basis of Perenchio's representation that defendant would pay for the wine, but this does not serve to preclude a recovery against defendant as a member of the joint venture. Plaintiff's right to recover against defendant is not dependent upon any promise made by Perenchio that defendant would pay for the wine but rather upon the liability of defendant as a member of the venture for the unpaid purchase price of the wine, which the court found was sold to the venture and title to which was taken in the name of the defendant.

██ Nor is it of consequence that, as found by the trial court, defendant did not know from whom Perenchio had purchased or was purchasing the wine. As a member of the venture defendant became liable for the wine purchased by his

coadventurer on behalf of the venture without regard to his lack of knowledge as to the identity of the seller. At the time he executed the joint venture agreement and before he contributed any money to the venture, he knew that Perenchio was purchasing the wine from someone and that the purchase price therefor had not been paid.

In respondent's brief it is said that "The trial court decided against plaintiff on the grounds of equitable estoppel, or by invoking the maxim that between two innocent parties the one whose act caused the loss should suffer," and so it appears from the findings. Seeking to justify the judgment upon this basis, defendant professes to rely upon those authorities which declare the familiar rule that where the owner of personal property clothes another with the indicia of ownership thereof or apparent title to it, such owner is estopped from afterward asserting his title against an innocent third party who was induced to deal with the apparent owner in reference thereto.

Defendant's argument upon this score is difficult to follow inasmuch as the issuance of the warehouse receipt in defendant's name vested title in him as trustee for the joint venture —not in some third person with whom defendant dealt in the honest belief, engendered by the receipt, that such person was the owner of the wine. The situation here is not that envisaged by the rule upon which defendant relies. This is made evident by the very authorities cited in respondent's brief. Thus in *Phelps* v. *American Mortgage Co.*, 40 Cal.App. 2d 361 [104 P.2d 880], therein cited, the plaintiffs delivered a number of promissory notes owned by them, endorsed in blank, to the defendant for the purpose of collection. The defendant, in violation of its trust, sold the notes to bona fide purchasers for value, and it was held that the latter acquired good title thereto as against the plaintiffs. This holding does not suggest, however, as counsel's argument would seem to assume, that if the notes had been sold and delivered by the plaintiff directly to the parties who purchased them from the defendant upon their promise to pay plaintiffs therefor, the latter would be precluded from recovery simply because they had not demanded and received payment at the time of the delivery of the notes. We are at a loss to understand the statement in respondent's brief to the effect that by issuing the warehouse receipt in defendant's name, plaintiff knew that it "was vesting Perenchio with evidence of ownership before Perenchio had paid for the wine." By what process of reason-

ing may it be said that the issuance of a warehouse receipt for goods in the name of "A" vests "evidence of ownership" of the goods in "B"? And yet this is the sole basis upon which respondent's argument upon this score rests. There is, of course, no question but that plaintiff, when it caused the warehouse receipt to be issued in defendant's name, knew that the purchase price of the wine had not been paid, but this fact was likewise known to the defendant at the time. Indeed, the terms of the joint venture agreement pursuant to which Perenchio, upon behalf of the venture, negotiated with plaintiff for the purchase of the wine, contemplated that the transaction would be handled in precisely this manner.

Neither does the factual situation here call into play the maxim that "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." (Civ. Code, § 3543.) The only fact to which defendant points as constituting negligence upon the part of plaintiff, is the issuance of the warehouse receipt in defendant's name in advance of the payment of the purchase price of the wine. It would indeed be a strange doctrine which declared that a vendor of personal property who vested title thereto in his vendee in advance of the receipt of the purchase price thereof was guilty of negligence, and by virtue of this maxim precluded from recovery of the purchase price thereof from his purchaser. The complete answer to this argument is to be found in the following statement appearing in defendant's own brief: "The fact is that in the commercial world, title to merchandise passes every day before the purchase price has been paid." Surely, conduct conforming to such a universal practice may not be characterized as negligent. Moreover, defendant could not, by the issuance of the warehouse receipt in his name, have been deceived into believing that the purchase price of the wine had been paid, for he knew the contrary to be the fact.

If the maxim in question were here applicable and the loss could be said to be due to the negligence of any one, it would appear to be that of the defendant rather than the plaintiff. Defendant met Perenchio for the first time shortly before entering into the joint venture agreement. He testified that he knew nothing concerning him other than that he had been told by an attorney friend of the defendant who introduced him to Perenchio, that the latter was a wine broker and had a fine reputation. From the inception, defendant knew that the wine was stored on the premises of the Village Winery at

Escalon; that there was unpaid upon the purchase price at least $32,000; that Perenchio claimed to have previously paid on account of the wine $6,750, and yet defendant made not the slightest inquiry to verify any of these facts. It appears to us that the necessity of some investigation with respect thereto would have suggested itself to a reasonably prudent person, which, if pursued, would have readily disclosed that Perenchio had not purchased or agreed to purchase the wine and had paid nothing on account thereof.

In truth, the loss which one of the parties to this proceeding must bear was occasioned solely by reason (1) of the failure of Perenchio to make his promised contribution to the capital of the joint venture in the form of a payment of $6,750 on account of the purchase price of the wine, and (2) Perenchio's wrongful act in converting to his own use money of the venture entrusted to his care by the defendant and designed to discharge the debt incurred by the venture for the purchase price of the wine. Each of these defaults was the act of the defendant's coadventurer and agent, and may not be attributed to the plaintiff. The venture having purchased and received the wine, the defendant, as a member thereof, may not escape liability for the unpaid balance of the purchase price thereof. (*Cf. Grant* v. *Weatherholt* (1954), 123 Cal.App.2d 34, 50 [266 P.2d 185].)

The judgment is reversed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied May 29, 1958, and respondent's petition for a hearing by the Supreme Court was denied July 9, 1958.