**In re Eugene Laurence JONES and Emma Gertrude Jones, Debtors.**

**Bankruptcy No. SB 85–04296 JW.**

United States Bankruptcy Court, C.D. California.

Jan. 27, 1987.

---

Daniel D. Zahner, Simon and Simon, San Bernardino, Cal., for debtors.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

Debtors, Eugene Laurence Jones and Emma Gertrude Jones ("Jones"), object to the allowance of the claim of Albert Fisher ("Fisher") filed in the amount of $1,000.

■ Although the debtors cite no basis for their objection, it appears to be predicated upon 11 U.S.C. § 502(b)(1). Section 502(b)(1) states:

[I]f ... objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured....

11 U.S.C. § 502(b)(1). State substantive law is applied to determine the existence and validity of a claim, unless the Bankruptcy Code provides otherwise. *In re Sparkman*, 703 F.2d 1097, 1099 (9th Cir. 1983); *In re Fantastik, Inc.*, 49 B.R. 510, 512–513 (Bankr.D.Nev.1985). However, "the allowance or disallowance of a claim is strictly a matter of federal law and is left to the bankruptcy court's just exercise of its equitable powers." *In re Fantastik,*

*Inc.*, 49 B.R. at 513. *See Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946), *reh'g denied,* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947); 3 *Collier on Bankruptcy* § 502.01 (15th ed. 1986).

### FACTS

In 1984, Jones saw an advertisement in the newspaper placed by John Wright ("Wright") dba Wright Developers looking for investors in a mobile home park development. Jones answered the advertisement and met with Wright to discuss the project. Jones accompanied Wright to inspect a mobile home park that Wright claimed to have developed, but made no other investigation of Wright's background. Later Jones discovered that Wright was merely a laborer on the project.

On June 29, 1984, Jones and Wright entered into a written agreement opening an escrow for the purchase of a 25% interest in Desert Hot Springs property owned by Wright. Jones made a $20,000 deposit toward a total purchase price of $150,000. Wright planned to develop this property into a rental mobile home park.

The agreement was poorly drafted and discussed the purchase in terms of both an interest in property and an interest in a venture development. According to the agreement, Wright Developers was responsible for all construction, with significant changes from the approved plans to be agreed upon with Jones. Jones was to assist in the actual operation of the venture when available. Both parties had approval rights of any potential future investor.

In April, 1984, Jones left for a lengthy trip with Wright remaining in charge. Apparently Jones traveled as far as Yuma when he discovered that Wright was selling the lots without the necessary permits or subdivision maps. Jones returned to the property and encountered several angry buyers. When questioned, Wright stated that he sold the lots after consulting with an attorney, but planned to return all deposits.

Subsequently, Jones discovered that Wright's name was actually Eugene Monte Naccoroto. In addition, Wright had falsified the appraisal which valued the property in excess of $600,000. The property was worth approximately one-half that amount.

To prevent foreclosure of the property, Jones prepaid the First and Second Trust Deed holder one year in advance. Jones then attempted to sell the property to a Chicago investor, but several factors, including Wright's irrational threats, prevented the sale. During the sale negotiations Jones wrote two letters to the claimants, including Fisher, assuring them that their deposits and expenses would be fully repaid with interest before he recovered anything on his investment. However, Jones told the buyers that to successfully effectuate the sale they should not press their claims in court. Fisher was one of the buyers who cooperated with Jones.

After the sale fell through, Jones and Wright filed separate Chapter 13 proceedings. Jones convinced Wright to quitclaim the entire property to him because he believed the property could not be sold as long as Wright was involved. Jones later sold the property as part of his bankruptcy reorganization to satisfy the First and Second Trust Deeds. He took back eleven lots, valued in the sale agreement at $10,000 each, as payment for his equity. However, the evidence established that the property remains undeveloped and it is doubtful that the lots are worth $10,000 each.

Wright was charged with and convicted of grand theft in the Municipal Court of the Desert Judicial District, County of Riverside, State of California.

## DISCUSSION

Jones objects to Fisher's claim arguing that he is not indebted to Fisher because the debt, if any, was incurred by John Wright dba Wright Developers, not him. Jones maintains that he never intended to enter into a partnership or joint venture with Wright.

Fisher contends that Jones and Wright were engaged in a joint venture and that Jones is liable for any debts incurred by the venture. Therefore, Fisher argues that his claim for the amount of his deposit on the lot should be allowed in Jones's Chapter 13 reorganization plan.

A joint venture is frequently defined as an association of two or more persons who carry out a single business enterprise for profit. *Holtz v. United Plumbing & Heating Co.*, 49 Cal.2d 501, 506, 319 P.2d 617 (1957). Although a joint venture is usually formed for a specific transaction or single series of transactions and a partnership ordinarily involves a continuing business, "the incidents of both relationships are the same in all essential respects." *Bank of California v. Connolly*, 36 Cal.App.3d 350, 364, 111 Cal.Rptr. 468 (1973). To create a joint venture, the parties must have an agreement "under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." *Holtz*, 49 Cal.2d at 506–507, 319 P.2d 617.

The agreement need not be formal or definite in every detail, but may be implied as a reasonable deduction from the acts and declarations of the parties. *Holtz*, 49 Cal.2d at 507, 319 P.2d 617; *Weinstock v. L.A. Carpet, Inc.*, 234 Cal.App.2d 809, 813, 44 Cal.Rptr. 852 (1965). Accordingly, the existence of a joint venture is primarily a factual question determined by the trier of fact from the evidence and inferences which may be drawn from it. *Nelson v. Abraham*, 29 Cal.2d 745, 749–750, 177 P.2d 931 (1947); *Connolly*, 36 Cal.App.3d at 364, 111 Cal.Rptr. 468.

■ Jones argues that his participation in the development of the mobile home park was limited to that of passive investor, not joint venturer. The evidence refutes this assertion. The existence of a joint venture depends on the parties' intent. *Rosen v. E.C. Losch Co.*, 234 Cal.App.2d 324, 331, 44 Cal.Rptr. 377 (1965). Elements common to a joint venture which afford objective evidence of the parties' intent are: (1) a single enterprise; (2) a community of interest; (3) a sharing of both profits and

losses; and (4) the right of joint participation in the management and control of the business. *Id.* at 332, 44 Cal.Rptr. 377. All four elements are present in this case.

First, the development of the mobile home park was a single enterprise. The evidence does not establish that Wright and Jones were involved in other enterprises. Jones testified that he was involved with Wright only in the development of the Yellow Rose Country Club.

Second, a community of interest is reflected by the written agreement between Jones and Wright. The agreement purports to be a contract and receipt for the deposit of $20,000 into escrow for the purchase by Jones of a 25% interest in approximately 30 acres in Desert Hot Springs at a total price of $150,000. According to the agreement, Jones provided the initial capital. Wright was responsible for all construction, financing, and development supervision. This agreement reflected the parties' common goal of developing and completing the mobile home park.

Third, the written agreement stated that the parties would share the profits from the venture in proportion to their percentage of interest. These percentages also applied to profits from any sales, including sales of mobile homes and modular homes. Although the agreement does not specifically provide for the sharing of losses as well as profits, the law implies an obligation of the parties to bear losses in the same proportion as the agreement provides for the division of profits. 6 Witkin, *Summary of Cal. Law,* Partnership, § 17, p. 4269 (8th ed. 1974).

Fourth, the parties jointly participated in the management and control of the development of the mobile home park. The written agreement stated that Jones was to agree to any significant changes in the approved plans and he had approval rights for all financing. Furthermore, Jones was to assume responsibility for any construction loans in direct proportion to the percentage of his investment and to have the right to approve potential future investors.

In addition, the agreement maintains that if no other investors became "co-owners/partners" in the venture, then Jones's percentage increased to 35%. The phrase "co-owners/partners" evidences some uncertainty regarding whether the parties intended that Jones would be a co-owner of the property or a partner in the development of the mobile home park. However, this uncertainty is dispelled by other language in the agreement, which states that when available Jones will assist in the actual operation of the venture, including legal matters, formulating park rules, establishing park procedures, and hiring employees.

Finally, Jones and Fisher testified that Jones parked his camper at the development site. Fisher talked with Jones in his camper before and after Fisher purchased his lot. On one such occasion Fisher saw Jones watering a newly landscaped area. Jones also testified that when he returned from Arizona he questioned Wright about the illegal sales of the lots and talked with many of the irate purchasers.

Thus, although Jones testified that he was merely a passive investor, this testimony is not persuasive. The evidence firmly establishes joint participation in the management and control of the development by both Jones and Wright. Accordingly, the Court finds that Jones and Wright intended to and did engage in a joint venture to develop the Yellow Rose Country Club.

■ Jones also argues that he should not be liable for Fisher's claim because he lost significantly more money in the venture than Fisher. Jones contends that he was an innocent victim as well.

This argument is not persuasive. The rights and liabilities of joint venturers are governed by the principles applicable to partnerships. *Stodd v. Goldberger,* 73 Cal. App.3d 827, 836, 141 Cal.Rptr. 67 (1977). "In contracts with third persons the law imposes liability upon one who either represents himself or consents to another representing him as a partner in an actual or apparent partnership." *Deicher v. Corkery,* 205 Cal.App.2d 654, 662, 23 Cal.Rptr. 270 (1962). Compare this situation with

the analogous situation upon the dissolution of a partnership wherein even a limited partner's return of capital contributions is subordinated to claims of creditors of the partnership. *See* Cal.Corp.Code §§ 15523, 15684.

In *Lindner v. Friednash*, 160 Cal.App.2d 511, 325 P.2d 612 (1958), two parties entered into a joint venture to purchase and sell wine. One joint venturer contributed capital to the venture with the understanding that his coadventurer would also invest money. Although the coadventurer never invested any money, he secured delivery of the wine on credit, and proceeded to misappropriate the invested capital and some of the wine. The innocent coadventurer claimed that he should not be liable for the price of the wine. The court held that one joint venturer may not escape liability for the price of goods sold to the venture although a portion of the money he contributed to the venture to pay for the goods was converted by the wrongful act of the coadventurer to the latter's own use, as was a portion of the goods. *Id.* at 518, 325 P.2d 612.

Similarly, Jones may not escape liability for Fisher's claim even though he lost his investment in the venture. At the time Wright sold the lots, Jones was embarking on an extended trip. Jones left Wright in charge of the mobile home park, and as established by their written agreement, vested broad authority in Wright to make decisions and direct the operations of the development. Thus, Jones consented to Wright representing him in the joint venture and is responsible for debts flowing from that consent.

Furthermore, "[w]here one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." Cal.Civ.Code § 3543. Jones testified that he graduated from Michigan State University with an undergraduate degree in general psychology and a graduate degree in industrial psychology, and worked for the Rand Corporation for several years. Additionally, after his retirement Jones engaged in a joint venture to develop a mobile home park in San Diego. Yet, Jones testified that he decided to invest $150,000 of his retirement funds in the development of a second mobile home park based upon a newspaper advertisement without even the most cursory investigation into Wright's veracity. Between Jones and Fisher, Jones was in the better position to investigate Wright's background and prevent the subsequent losses. Thus, the loss must be borne by Jones whose misplaced confidence enabled the injury to occur.

■ Jones's argument that his liability was terminated by Wright's criminal acts is inapposite. It is well established that under California law, "a partnership, not being a legal entity, cannot ... commit a crime, and that where criminal acts are committed through a partnership, the culpable members of the partnership are held criminally responsible, rather than the partnership itself." *United States v. Brookman Co.*, 229 F.Supp. 862, 864 (N.D.Cal. 1964). However, the issue before the Court is the liability of Jones for a claim arising out of the actions of the joint venture, not from any alleged criminal activity.

Alternatively, Fisher argues that his claim should be allowed based upon a separate contract with Jones as evidenced by conversations and letters from Jones during the attempted sale of the property to the Chicago investor. Because the Court holds that Jones and Wright were engaged in a joint venture and that Jones is liable for debts incurred by the venture, the Court finds it unnecessary to address this argument.

## CONCLUSION

Jones's objection to Fisher's claim is overruled. The court finds that Jones and Wright engaged in a joint venture to develop the Yellow Rose Country Club. Fisher's claim for the amount of his deposit is allowed against the Chapter 13 plan of Jones, one of the joint venturers. This memoran-

dum of decision incorporates the Court's findings of fact and conclusions of law. Fisher shall lodge and serve a judgment consistent with this memorandum of decision.